[No. S104477. May 27, 2004.]

ROSEMARIE GAVALDON et al., Plaintiffs and Appellants, v.
DAIMLERCHRYSLER CORPORATION, Defendant and Appellant.

1248

## COUNSEL

Anderson & Anderson, Anderson Law Firm, Martin W. Anderson and Ivy Tsai for Plaintiffs and Appellants.

Norman Taylor & Associates, Norman F. Taylor and Bret A. Shefter for Consumers for Auto Reliability and Safety as Amicus Curiae on behalf of Plaintiffs and Appellants.

Kemnitzer, Anderson, Barron & Ogilvie, Bryan Kemnitzer, Alison A. Lawton; Rosner Law & Mansfield, Alan M. Mansfield and Lilys D. McCoy for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Horvitz & Levy, Lisa Perrochet, John A. Taylor, Jr., Jon B. Eisenberg; Even, Crandall, Wade, Lowe & Gates, Gates, O'Doherty, Gonter & Guy, Douglas D. Guy and Matthew M. Proudfoot for Defendant and Appellant.

Manning, Leaver, Bruder & Berberich and Halbert B. Rasmussen for California Motor Car Dealers Association as Amicus Curiae on behalf of Defendant and Appellant.

Bowman and Brooke, Brian Takahashi and Ronald G. Akasaka for the Alliance of Automobile Manufacturers as Amicus Curiae on behalf of Defendant and Appellant.

Barger & Wolen, Steven H. Weinstein and Alena K. Hacopian for National Association of Independent Insurers as Amicus Curiae on behalf of Defendant and Appellant.

## OPINION

**MORENO, J.—** ■ The Song-Beverly Consumer Warranty Act (hereafter sometimes the Act or the Song-Beverly Act), Civil Code section 1791 et seq.,[1] provides, in section 1793.2, subdivision (d)(2), that when a manufacturer does not repair a motor vehicle to conform to an express warranty after "a reasonable number of attempts," the buyer may opt to have the item replaced, or may return the item and obtain restitution for its cost (hereafter sometimes the replacement/restitution remedy). In the present case, the trial court found that plaintiff Rosemarie Gavaldon's Dodge Caravan minivan was substantially impaired because of a defective transmission that defendant DaimlerChrysler Corporation and its representatives (hereafter DaimlerChrysler) had been unable to repair after numerous attempts. The court found that the defect arose after the expiration of Gavaldon's 3-year/36,000-mile warranty. Nonetheless, the court concluded that Gavaldon was entitled to section 1793.2, subdivision (d)'s replacement/restitution remedy because the transmission defect was covered by Gavaldon's 7-year/70,000-mile service contract, and that, for purposes of the Song-Beverly Act, a service contract was a type of express warranty. The trial court therefore awarded Gavaldon the purchase price of the vehicle, minus the value attributed to its past use (see § 1793.2, subd. (d)(2)(C)), for a total of $13,623.63, plus attorney fees provided under the Act. The Court of Appeal disagreed and reversed the trial court's award. Gavaldon's petition for review calls on us to decide whether a service contract is an express warranty within the meaning of the Act. We conclude that it is not.

Gavaldon also contends that even if a service contract is not an express warranty, section 1794, governing remedies available under the Act, authorizes the replacement/restitution remedy for breaches of service contracts. As explained below, we conclude Gavaldon misreads the statute. Gavaldon also contends that she may prevail on the theory that she properly revoked acceptance of the vehicle, and is therefore authorized to be reimbursed for the vehicle under section 1794, subdivision (b), which expressly incorporates

---

[1] All statutory citations are to this code unless otherwise indicated.

various California Uniform Commercial Code remedies into the Act. We conclude the Court of Appeal is correct that she did not properly raise this issue below, and we will not consider it here. We also conclude that Gavaldon did not properly raise in the Court of Appeal the issue of whether the judgment in her favor could be sustained on the theory that DaimlerChrysler's breach of the service contract entitled her to damages based on the diminution in the value of the automobile.

## I. STATEMENT OF FACTS

The facts below are taken largely from the Court of Appeal opinion. Gavaldon bought her new Dodge Caravan minivan in June 1993. The vehicle came with DaimlerChrysler's standard factory warranty under which the owner could choose either a 3-year/36,000-mile basic warranty (the 3/36 warranty) or a 12-month/12,000-mile basic warranty plus a 7-year/70,000-mile power train coverage. Gavaldon stipulated, and the trial court found, that the 3/36 warranty applied.

When Gavaldon purchased the minivan, she also purchased a service contract, issued by DaimlerChrysler, for an additional $890. The service contract provided it was to "protect [the buyer] against major repair bills should a component covered by the Plan fail in normal use." The stated coverage was: "The plan will pay the total cost (parts and labor) less a $25 deductible per visit, to correct any of the following part failures, due to a defect in materials or workmanship, not covered by the vehicle limited warranties." Covered components included power train parts such as the engine and transmission. The service contract advised the buyer that the vehicle might also be covered by a manufacturer's limited warranty, that only vehicles covered by one of DaimlerChrysler's standard limited warranties are eligible for the service contract, and that it did not cover "[r]epair or replacement of any component covered by the vehicle's factory warranty or recall policies." It provided that coverage for repairs would not start until the vehicle limited warranties expired, and would end "7 years after the factory warranty start date or when the vehicle has accumulated 70,000 total miles of service (whichever occurs first)." The service contract warned the buyer, "Important! The maximum reimbursable amount should a covered component fail will be the Total Cost of the Repairs Less the Deductible or, If Less, the Cash Value of the Vehicle!"

After she had driven the minivan about 22,000 miles, Gavaldon began to notice the transmission was "slipping." Although she took the vehicle to the dealer for regular service at 25,854 miles, 30,868 miles and 34,467 miles, she made no mention of any transmission problems.

At 39,361 miles, and again at 43,686 miles, Gavaldon took the minivan to the dealer for regular service and complained the transmission was shifting "hard" and getting stuck in gear. On both occasions, the dealer investigated but found no problems.

At 44,346 miles, the vehicle's transmission became stuck in "limp-in mode" and was towed to the dealership. In limp-in mode, the vehicle gets locked in second gear to protect the transmission from further damage while permitting the car to be driven at a reduced speed to a repair facility. The transmission was removed, overhauled, and the torque converter replaced. The repairs were covered by the service contract.

At 47,901 miles, Gavaldon took the minivan to the dealer, complaining it was stalling at stops and surging as if running out of gas. The throttle position sensor, spark plug wires, and transmission controller were replaced. These repairs were covered by the emissions systems warranty.

At 48,644 miles, the vehicle was towed to the dealer because of overheating. The water pump, water pump gasket, and a heater hose were replaced and the repairs were covered by the service contract. Although the dealer records made no mention of complaints about the transmission, Gavaldon testified the car was stuck in limp-in mode and she complained about the transmission.

At 50,989 miles, Gavaldon brought the car in, complaining the transmission was slipping in and out of limp-in mode. The solenoid pack, which controls the transmission's hydraulic fluid, was replaced, as were a throttle positioning sensor and wiring harness.

At the same time in February 1997, Gavaldon wrote to the dealer, and then directly to DaimlerChrysler, complaining of the vehicle's chronic transmission problems and asking that it be repurchased or replaced. Her request was denied.

At 54,922 miles, Gavaldon brought the car to the dealer complaining about the transmission's hard shifting and slipping. The dealer determined that the front and rear brakes were in disrepair, that they had been worked on by another repair shop, and that it could not authorize its service personnel to drive the vehicle without first repairing the brakes. Gavaldon did not authorize that work. The dealer was unable to verify or diagnose the transmission complaint.

In July 1997, at 56,922 miles, the minivan again got stuck in limp-in mode and was towed to the dealer. The transmission was completely replaced. The

service contract covered the cost of the repairs. This new transmission was itself replaced at 57,589 miles under a parts warranty because it was leaking.

Gavaldon testified that these measures did not solve her transmission problem, and she continued to experience hard shifting and slipping. She did not present the minivan for further repairs. In October 1997, she filed her complaint alleging DaimlerChrysler had breached its obligations under section 1793.2, subdivision (d), by failing to promptly replace or repurchase the minivan when it was unable to conform the vehicle to the applicable express warranties after a reasonable number of attempts. She also alleged DaimlerChrysler breached the express warranty under the Act and common law. Gavaldon alleged the vehicle was covered by the 3/36 warranty, a defect arose while that express warranty was still in effect, and DaimlerChrysler breached the express warranty by failing to remedy the defect. At trial, Gavaldon was permitted to amend her complaint to allege breach of the service contract as well.

A jury trial ended in a mistrial when the judge became ill. A second trial, this time a bench trial, commenced. Before it began, the trial court ruled the service contract was not an express warranty under the Song-Beverly Act.

On August 17, 1999, the court issued a tentative ruling in favor of DaimlerChrysler. It concluded the minivan's transmission was defective, but that the defect arose after the applicable 3/36 warranty had expired. It concluded the service contract was not an express warranty. Thus, the court stated, the "only remedy available to plaintiff[ ] is the repairs under the service agreement." A judgment for DaimlerChrysler was entered on August 24.

On September 10, Gavaldon filed a notice of intention to move for a new trial. At a hearing on September 14, the court noted that its August 17 ruling was only a tentative ruling and it had now reached a different conclusion about the nature of the service contract. The court stated the August 24 judgment had been entered by mistake; the court had not intended that a final judgment be entered because it had not yet finished deciding the case; and vacated the August 24 judgment.

On September 15, the court issued a new tentative ruling in favor of Gavaldon. In response to DaimlerChrysler's request, the court issued a formal statement of decision on October 6, which included answers to questions posed by DaimlerChrysler. The court concluded that the service contract constituted an express warranty, a conclusion it believed to be compelled by the holding in *Reveles v. Toyota by the Bay* (1997) 57 Cal.App.4th 1139 [67 Cal.Rptr.2d 543] (*Reveles*). Given that conclusion, and given the trial court's

finding that "plaintiffs suffered damages [from] having purchased an automobile that was substantially impaired," the trial court ruled that Gavaldon was entitled to the replacement/restitution remedy set forth in section 1793.2, subdivision (d). The court concluded that DaimlerChrysler was entitled to an offset for the use of the vehicle until the time Gavaldon first delivered it for correction, pursuant to section 1793.2, subdivision (c), which it determined to be at 44,388 miles, when the transmission first became stuck in limp-in mode. Further, the trial court found that Gavaldon was entitled to costs, including attorney fees, but not to civil penalties. In response to the question "whether [Gavaldon] would have the remedy under the Song-Beverly . . . Act if the service contract purchased at additional cost is not considered an express warranty under the [Act]," the trial court replied: "Not at the time this decision was brought."

A judgment awarding Gavaldon $13,612.63 (purchase price minus a deduction for actual use of the vehicle) was entered on November 5, 1999. DaimlerChrysler appealed the November 5 judgment. A postjudgment order awarded Gavaldon $75,000 in attorney fees and costs. DaimlerChrysler appealed that order as well and the two appeals were consolidated.

The Court of Appeal reversed. After reviewing the statutory language and legislative history of the Song-Beverly Act, it concluded that the service contract could not be considered an express warranty under the Act. It further concluded that *Reveles* was distinguishable on various grounds. It also rejected Gavaldon's contention that the judgment could be upheld on the alternative ground that it was an appropriate award for breach of the service contract, holding that the trial court had rejected that theory and sufficient evidence supported the trial court's ruling. The court rejected as not properly raised below Gavaldon's further claim that she was entitled to the damages award under a provision of the California Uniform Commercial Code because she had revoked acceptance of the vehicle. It also reversed Gavaldon's award of costs and attorney fees. We granted review.

## II. Discussion

### A. Is a Service Contract an Express Warranty Within the Meaning of the Song-Beverly Act?

The Song-Beverly Act, in section 1793.2, subdivision (d)(2), provides in pertinent part that " [i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle . . . to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle . . . or promptly make restitution to the buyer . . . . However, the buyer shall be free

to elect restitution in lieu of replacement, and in no event shall the buyer be required by the manufacturer to accept a replacement vehicle." Gavaldon argues that a service contract is an "express warranty" within the meaning of that section and the Song-Beverly Act generally, and therefore she is entitled to the replacement/restitution remedy, as the trial court concluded. DaimlerChrysler contends that the Court of Appeal is correct in holding that a service contract is not an express warranty, and the judgment cannot be sustained. We conclude that DaimlerChrysler is correct.

DaimlerChrysler essentially advances two arguments as to why a service contract cannot be considered an express warranty: (1) a service contract, as defined by statute, does not fit the statutory definition of "express warranty"; and (2) aside from the definitions, the terms "service contract" and "express warranty" are used together in the statute in such a way as to make clear that they are mutually exclusive terms. We find the second persuasive. The legislative history of the Act provides additional support for Daimler-Chrysler's interpretation.

### 1. The Definitions of "Express Warranty" and "Service Contract"

An express warranty under the Song-Beverly Act is defined in section 1791.2 in pertinent part as follows: "(a) . . . A written statement arising out of a sale to the consumer of a consumer good pursuant to which the manufacturer, distributor, or retailer undertakes to preserve or maintain the utility or performance of the consumer good or provide compensation if there is a failure in utility or performance; . . . [¶] . . . [¶] (b) It is not necessary to the creation of an express warranty that formal words such as 'warrant' or 'guarantee' be used, but if such words are used then an express warranty is created. An affirmation merely of the value of the goods or a statement purporting to be merely an opinion or commendation of the goods does not create a warranty. [¶] (c) Statements or representations such as expressions of general policy concerning customer satisfaction which are not subject to any limitation do not create an express warranty."

Section 1791, subdivision (o) provides: " 'Service contract' means a contract in writing to perform, for an additional cost, over a fixed period of time or for a specified duration, services relating to the maintenance, replacement, or repair of a consumer product, except that this term does not include a policy of automobile insurance, as defined in Section 116 of the Insurance Code."

DaimlerChrysler argues that an express warranty "arises out of the sale of a consumer good" (see § 1791.2, subd. (a)) because "it is a representation

integrally included in the purchase price; a service contract does not because it offers additional performance purchased for 'additional cost.' " (See § 1791, subd. (o).) Moreover, it argues, section 1794.4 addresses the "sale of a service contract," implying that a service contract is sold separately from the consumer good, and therefore cannot be said to "arise out of" the sale of the latter. Gavaldon points out, however, that the purchase of her automobile and her service contract were part of the same transaction, concluded at the same time, and therefore the service contract would be reasonably understood to "arise out of" the sale of the automobile. (See *Reveles, supra,* 57 Cal.App.4th at pp. 1155–1156.)

We need not decide which party has the better argument. As discussed below, another reason supports the conclusion that DaimlerChrysler's position is correct.

### 2. *The Use of the Terms Together in the Statute*

The terms "service contract" and "express warranty" are used together in several sections of the Song-Beverly Act in such a way as to indicate, DaimlerChrysler argues, that the Legislature conceived of them as distinct entities. Section 1794.41, subdivision (a)(3), for example, provides: "The [service] contract is applicable *only* to items, costs, and time periods *not covered by the express warranty.* However, a service contract may run concurrently with or overlap an express warranty if (A) the contract covers items or costs not covered by the express warranty or (B) the contract provides relief to the purchaser not available under the express warranty, such as automatic replacement of a product where the express warranty only provides for repair." (Italics added.)

Section 1794.4, subdivision (a) provides that "Nothing in this chapter shall be construed to prevent the sale of a service contract to the buyer *in addition to, or in lieu of,* an express warranty if that contract fully and conspicuously discloses in simple and readily understood language the terms, conditions and exclusions of that contract . . . ." (Italics added.) And section 1794, subdivision (a) provides: "Any buyer of consumer goods who is damaged by a failure to comply with any obligation under this chapter or under an implied or express warranty *or service contract* may bring an action for the recovery of damages and other legal and equitable relief." (Italics added.)

██ The above three statutes indicate that the Legislature not only conceived of service contracts as distinct from express warranties, but intended the two categories to be mutually exclusive. Section 1794.41, subdivision (a)(3), does not permit a service contract to cover the same items as an express warranty. Section 1794.4 specifies that service contracts are sold in

addition to or in lieu of express warranties. And section 1794 refers to express warranties and service contracts in the alternative. If express warranties and service contracts were intended to overlap, then these sections would have been phrased differently, by modifying the term "express warranty" to at least leave open the possibility of overlap. For example, section 1794.4, subdivision (a) might have read: "Nothing in this chapter shall be construed to prevent the sale of a service contract to the buyer in addition to, or in lieu of, an express warranty *that is included in the original price of the consumer good* if that contract fully and conspicuously discloses in simple and readily understood language the terms, conditions and exclusions that contract . . . ." Without such a modifier to the term "express warranty," it is difficult to escape the inference that the Legislature considered service contracts to be categorically distinct from express warranties.

The legislative history of the Song-Beverly Act supports this interpretation. As originally enacted, the Song-Beverly Act's sole reference to service contracts was the provision in section 1794.4 allowing service contracts to be sold "in addition to or in lieu of" express warranties. (Stats. 1970, ch. 1333, § 1, p. 2482.) The Act was amended in 1971 to, among other things, specify in section 1791, subdivision (a), that the term "consumer goods" with which the Act was concerned signified "new" goods. (Stats. 1971, ch. 1523, § 2, p. 3001.) At the same time, section 1795.5 was added to extend the Song-Beverly Act's application to used consumer goods sold with express warranties. It provided that, notwithstanding the definition of consumer goods as new goods, the obligation of a distributor or retail seller of used consumer goods in a sale in which an express warranty is given "shall be the same as that imposed on the manufacturer under this chapter," with certain enumerated exceptions. (Stats. 1971, ch. 523, § 17, p. 1028.)

In response to concerns about the prospective enactment of section 1795.5 from the Northern California Motorcar Dealers Association, Inc., Senator Song's staff assured the association that the proposed remedies with respect to express warranties on used vehicles would not apply to used vehicles with service contracts. That response is perhaps the clearest window we have into the Legislature's reason for distinguishing between a service contract and an express warranty. It stated: "You may be correct that the distinction between a warranty and a service contract is purely one of semantics, but such is often the most important kind. I believe the words 'guarantee' and 'warranty' possess a meaning that 'service contract' does not share. . . . We think that an 'as is' sale, with or without a service contract, will better inform the public as to what they are actually buying than a sale accompanied by the express

warranties presently used in the used car trade." (Richard Thomsen, Admin. Asst. to Sen. Song, Letter to Wallace O'Connell, Apr. 16, 1971, p. 2.)[2]

 It is true that, functionally speaking, warranties and service contracts appear to have the same purpose—to guarantee the repair or replacement of certain products or parts of products for a specified period of time. But, as the above passage suggests, the Legislature apparently conceived of an express warranty as being part of the purchase of a consumer product, and a representation of the fitness of that product that has particular meaning for consumers. In contrast, it apparently thought of the purchase of a service contract as distinct from the purchase of the product, and not as a representation of fitness but only an agreement to provide repair services, a kind of insurance. Hence, one difference between express warranties and service contracts is that the latter is generally purchased "for an additional cost."[3] (§ 1791, subd. (o).)

In arguing that express warranties and service contracts do indeed overlap, Gavaldon points to language in the definition of express warranty in section 1791.2 stating that "[i]t is not necessary to the creation of an express warranty that formal words such as 'warranty' or 'guarantee' be used, but if such words are used then an express warranty is created." Therefore, a service contract that is denominated an "extended warranty," as service contracts are sometimes called, will also be an express warranty under section 1791.2, and therefore subject to ·the replacement/restitution remedy.

---

[2] Although in subsequent years the Legislature enacted more protection for consumers who purchased service contracts, there is no indication from subsequent amendments or their legislative history that the Legislature ever sought to blur or abandon this distinction between service contracts and express warranties. For example, in 1985, Assembly Bill No. 2285 (1985–1986 Reg. Sess.) amended section 1794.4 and enacted section 1794.41 to add certain disclosure and cancellation requirements for motor vehicle service contracts. Commenting on these changes, an analysis by the Department of Consumer Affairs, included in Governor Deukmejian's enrolled bill file, demonstrates that service contracts and express warranties continued to be thought of separately: "Existing law regulates implied and express warranties on consumer goods, including motor vehicles, sold in California. Existing law does not specifically regulate service contracts on consumer goods, other than to require that all of the terms and conditions be disclosed in the contract." (Dept. of Consumer Affairs, Enrolled Bill Rep. on Assem. Bill No. 225 (Sept. 20, 1985) p. 1.)

[3] We say "generally" because the phrase "for an additional cost" was not part of the original definition of "service contract," and is set to be deleted from its future definition. When section 1791, subdivision (o) was originally enacted in 1976, it did not contain the phrase "for an additional cost." (Stats. 1976, ch. 416, § 1.5, p. 1068.) That phrase was only added in 1993. (Stats. 1993, ch. 1265, § 12, p. 7419.) An amendment enacted in 2002, but not effective until 2008, deletes the phrase. (Stats. 2002, ch. 405, § 62.) It is unclear from the legislative history why the phrase was added, and why it is to be deleted. In light of these amendments, it may be the case that some instruments will be considered service contracts despite the fact that they were not purchased for an additional·cost. Nonetheless, the "additional cost" factor appears to be an important, if not infallible, means of distinguishing between express warranties that are an integral part of the purchase of a product, and service contracts that are not.

This argument does not assist Gavaldon. As discussed above, the Legislature apparently believed that the terms "warrant" or "guarantee" had particular significance to consumers. And because the Legislature generally conceived of service contracts and extended warranties as falling into distinct categories, it also provided that a manufacturer that confused those categories by labeling service contracts as warranties should assume the obligations imposed on manufacturers that issued express warranties. DaimlerChrysler did not so label its service contract in the present case.

Gavaldon also argues that sections 1794.4 and 1794.41 are antifraud provisions, designed to protect a consumer who pays for an express warranty, as part of the price of the vehicle or other consumer good, from paying extra for a service contract that partly provides the same coverage as the warranty. Assuming she is correct, such purpose is nonetheless wholly consistent with the Legislature's view that service contract and express warranty should be considered distinct entities.

In sum, reading the various portions of the Act, together with relevant legislative history, it appears that the Legislature thought of service contracts and express warranties as mutually exclusive categories, except when the manufacturer chooses to use the terms "warrant" or "guarantee" in a service contract. When, as here, the manufacturer has not used those terms in its service contract, the breach of its service contract does not make it subject to the replacement/restitution remedy reserved in section 1793.2, subdivision (d) for purchasers of motor vehicles sold with "express warranties."

### 3. *The Reveles Case*

Gavaldon argues that the above conclusion conflicts with the Court of Appeal's holding in *Reveles, supra,* 57 Cal.App.4th 1139. The Court of Appeal in the present case usefully summarized *Reveles*: "In that case, the plaintiff purchased a used vehicle from a dealership. The sale was 'as is,' i.e., without an express warranty, so he also purchased a 'vehicle service agreement' covering 'repair of mechanical failures' of various parts for two years or 24,000 miles. Two months later, the front end of the car suddenly dropped, and the dealer's mechanic told the plaintiff the vehicle had significant preexisting frame damage and could not be repaired. Nonetheless, the dealer refused the plaintiff's demand it replace the vehicle or refund his purchase price, insisting repairs would be made. ([*Reveles,*] at p. 1145.)

"The plaintiff sued the dealer for breach of contract, rescission and restitution, negligent and intentional misrepresentation, breach of the Consumers Legal Remedies Act (§ 1750 et seq.) and breach of the Song-Beverly Act. After rejecting the plaintiff's repeated offers to settle for $9,300, on the

morning of trial the dealer announced it would settle for that amount. The plaintiff settled but reserved his right to move for attorney fees and costs to which he argued he was entitled under various statutes, including the Song-Beverly Act. The trial court eventually found the plaintiff was the prevailing party and awarded him $19,000 in attorney fees, plus expert witness fees and costs. (*Reveles, supra,* 57 Cal.App.4th at pp. 1146–1148.)"

The Court of Appeal affirmed the award, concluding in part that the plaintiff was the prevailing party under the Song-Beverly Act, and was therefore entitled to costs and attorney fees pursuant to section 1794, subdivision (d). (*Reveles, supra,* 57 Cal.App.4th at pp. 1149, 1158.) In so deciding, the court had to address the argument that the Act's remedies do not apply to used vehicles sold "as is." As discussed *ante,* the Act generally applies to the purchase of "consumer goods" which are generally defined as being "new" goods. (§ 1791, subd. (a).) Notwithstanding that definition, section 1795.5 provides, as noted *ante,* that the Act also applies to "used consumer goods in a sale in which an express warranty is given." The plaintiff's used car was sold "as is," but he had purchased a service contract. The court was faced with the issue of whether that service contract was an express warranty, in which case the used car purchaser would be afforded the Act's protection under section 1795.5.

In addressing the problem, the *Reveles* court reviewed the patchwork of relevant amendments to the Act. As noted above, the Act as originally passed in 1970 hardly mentioned service contracts, but subsequent amendments have increased protection for service contract purchasers. Section 1796.5, added in 1978, provides that any entity "which engages in the business of providing service or repair to new or used consumer goods has a duty to the purchaser to perform those services in a good and workmanlike manner." (Stats. 1978, ch. 991, § 13, p. 3066.)

Subdivision (b) of section 1794.4, added in 1988, states that "[e]xcept as otherwise expressly provided in the service contract, *every* service contract shall obligate the service contract seller to provide to the buyer of the product all of the services and functional parts that may be necessary to maintain proper operation of the entire product under normal operation and service for the duration of the service contract and without additional charge." (Stats. 1988, ch. 581, § 2, p. 2136, as amended by Stats. 1993, ch. 1265, § 13, pp. 7422–7423, italics added.) Additionally, section 1794.4, subdivision (c), added at the same time, requires the service contract to contain substantial information, including a "step-by-step explanation of the procedure which the buyer should follow in order to obtain performance of any obligation under the service contract . . . ." (See § 1794.4, subd. (c)(5); Stats. 1988, ch. 581, § 2, p. 2137.) Subdivision (d) was also added to section 1794.4, providing:

"Subdivisions (b) and (c) of this section are applicable to service contracts on new or used home appliances and home electronic products entered into on or after July 1, 1989. They are applicable to service contracts on *all other new or used products* entered into on and after July 1, 1991." (Stats. 1988, ch. 581, § 2, p. 2137, as amended by Stats. 1990, ch. 127, § 1, p. 1141, italics added.)

Section 1794 was added in 1982, enumerating the remedies available to a consumer for breach of the Act. It states in part: "Any buyer of *consumer goods* who is damaged by a failure to comply with any obligation under this chapter or under an implied or express warranty or *service contract* may bring an action for the recovery of damages and other legal and equitable relief." (§ 1794, subd. (a); Stats. 1982, ch. 385, § 2, p. 1716, as amended by Stats. 1987, ch. 1280, § 4, p. 4562, italics added.)

The *Reveles* court therefore confronted an apparent statutory anomaly, in which, under sections 1794.4 and 1796.5, buyers of any service contract, for either a new or used good, were entitled to the proper enforcement of the contract as well as various statutory protections, but the remedies provided under the Act, in sections 1794, and 1795.5, seemed not to include remedies for breaches of service contracts for used goods.

The *Reveles* court reasoned that "[i]f 'express warranty' under section 1795.5 is interpreted to exclude the vehicle service agreement, Reveles has no Song-Beverly Act remedy for [the dealership's] breach of sections 1794.4, subdivisions (b) and (d) and 1796.5, and they would thus be rendered meaningless." (*Reveles, supra,* 57 Cal. App.4th at p. 1157 [67 Cal.Rptr.2d 543].) But the fact that equating "express warranty" and "service contract" would solve an apparent statutory anomaly does not free us to so interpret the statute, when such interpretation would be at variance with the statutory language and the legislative history reviewed above. Although we will not interpret a statute literally if it leads to an absurd result, we cannot say that the statute's failure to explicitly provide a remedy under the Act for breaches of service contracts on used vehicles is an absurd result. We need not decide whether the result in *Reveles*—that attorney fees under the Act may be awarded for breach of a service contract on a used vehicle—is correct under a different rationale. But we disapprove of its conclusion that a service contract is a type of express warranty under the Song-Beverly Act.

For all the above reasons, we conclude that the service contract in the present case, which was sold for an additional cost and which does not use the words "warrant" or "guarantee," is not an express warranty for purposes of the Act.

B. *Section 1794 Does Not Provide a Replacement/Restitution*
 *Remedy for Breach of a Service Contract*

Gavaldon argues that even if we reject the argument that her service contract was an express warranty, section 1794, which concerns consumer remedies under the Song-Beverly Act, makes clear that the replacement/restitution remedy applies to a breach of a service contract as well as a breach of an express warranty. We conclude that Gavaldon is incorrect.

Section 1794 states in pertinent part that "(a) Any buyer of consumer goods who is damaged by a failure to comply with any obligation under this chapter or under an implied or express warranty or service contract may bring an action for the recovery of damages and other legal and equitable relief. [¶] (b) The measure of the buyer's damages in an action under this section shall include the rights of replacement or reimbursement as set forth in subdivision (d) of Section 1793.2."

Gavaldon contends that subdivision (b) signifies that anyone injured under subdivision (a) may obtain the replacement/restitution remedy. But the statute on its face does not so read. The right to replacement or restitution is qualified by the phrase "as set forth in subdivision (d) of section 1793.2." It is most reasonable to assume that this qualification means that the remedy is subject to the provisions set forth in section 1793.2, subdivision (d) (section 1793.2(d)), otherwise the reference to section 1793.2(d) would be superfluous. Gavaldon argues in effect that only some of the provisions of section 1793.2(d) apply, but not the provision stating that the replacement/restitution remedy is available only for breach of an express warranty. Gavaldon advances no principled basis for incorporating into section 1794, subdivision (b) some of the provisions found in section 1793.2(d) but not others.

Any ambiguity that might obscure this statutory language is dispelled by the relevant legislative history. The current version of section 1794, subdivision (b) came into being in 1987, when Assembly Bill No. 1367 (1987–1988 Reg. Sess.) (Assembly Bill No. 1367) amended the section to include the current language providing that "[t]he measure of a buyer's damages under this section shall include the rights of replacement or reimbursement as set forth in subdivision (d) of section 1793.2." (Stats. 1987, ch. 1280, § 4, p. 4562.) An uncodified provision, section 2 of the enactment, states that "the amendment of subdivision (b) of Section 1794 of the Civil Code . . . does not constitute a change in, but is declaratory of, existing law." (Stats. 1987, ch. 1280, § 9, p. 4567.)

The analysis by Senator Robbins, chairman of the Senate Insurance, Claims and Corporations Committee, states that before the amendment,

section 1794 did not "specifically mention that the buyer has the specific remedy of replacement of the product or restitution for the product. However, section 1793.2 of the Civil Code provides a replacement or restitution remedy for the buyer under specified conditions. . . . This bill was spawned when an automobile manufacturer in a court case argued (unsuccessfully) that the buyer can only sue for the remedy specifically enumerated in section 1794 of the Civil Code, which does not include replacement or restitution remedies." (Sen. Insurance, Claims and Corporations Committee, Analysis of Assem. Bill No. 1367, July 1, 1987.)

■ If Assembly Bill No. 1367 had been intended to extend the replacement/restitution remedies to service contracts, that would have constituted a significant change in the law. The uncodified section 9 of the 1987 enactment amending the Act and the legislative history recited above make clear that no such change was contemplated. Rather, the amendment of section 1794, subdivision (b) was intended to foreclose the then current argument that, because the replacement or restitution obligation imposed on manufacturers for violation of express warranties in section 1792.3(d) was not included in the remedies section of the Song-Beverly Act, section 1794, such remedy was not available to consumers. Accordingly, the legislative history confirms that the only reasonable reading of section 1794, subdivision (b) is that the replacement/restitution remedy applies only if the conditions of section 1793.2(d) are met.

### C. *Alternative Theories of Recovery*

In addition to the replacement/restitution remedy discussed above, section 1794 provides, in subdivision (b)(1): "Where the buyer has rightfully rejected or justifiably revoked acceptance of the goods or has exercised any right to cancel the sale, Sections 2711, 2712, and 2713 of the Commercial Code shall apply." Gavaldon claims that even if she is not entitled to restitution pursuant to section 1793.2(d) or section 1794, subdivision (b), her $13,612.63 damages award is nonetheless justified as a remedy for revoking acceptance of her automobile, pursuant to California Uniform Commercial Code section 2711.

California Uniform Commercial Code section 2608 provides the grounds on which a buyer can revoke acceptance of goods. It states in pertinent part: "(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it [¶] (a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or [¶] (b) Without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances. [¶] (2) Revocation of acceptance must occur within a reasonable time after the buyer

discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it."

■ As can be readily observed, revocation of acceptance requires more and different actions of the buyer than is required under section 1793.2(d). Whereas revocation of acceptance must take place "within a reasonable time after the buyer discovers or should have discovered the ground for it (Cal. U. Com. Code, § 2608, subd. (2))," the replacement/restitution remedy under Civil Code section 1793.2(d) only requires that the defect or defects be covered by an express warranty and that there be a failure to repair after a reasonable number of attempts. Revocation of acceptance must be done before "any substantial change in condition of the goods" (Cal. U. Com. Code, § 2608, subd. (2)), whereas Civil Code section 1793.2(d) has no such requirement. Therefore, a conclusion that a buyer is entitled to a remedy under section 1793.2(d) is not necessarily a conclusion that he or she is entitled to revoke acceptance of goods purchased and obtain the corresponding damages remedy.

As the Court of Appeal concluded, the revocation of acceptance theory was not presented at trial. Although Gavaldon's attorney did briefly argue, during the reply portion of his closing argument at trial, that a revocation of acceptance theory would apply, Gavaldon did not plead revocation of acceptance, nor did she move to amend her pleading, and the presentation of that theory appears to have been nothing more than an afterthought. We cannot say that Gavaldon properly raised the theory below, especially given the considerable difference between that theory and her main theory at trial, that she was entitled to a section 1793.2(d) replacement/restitution remedy. She may not do so now on appeal. (See *Gibson Properties Co. v. City of Oakland* (1938) 12 Cal.2d 291, 299–300 [83 P.2d 942] [plaintiff generally may not raise on appeal theory of damages different from theory at trial].)

Gavaldon also argues her damages award may be justified by the diminution in value of the automobile as a result of DaimlerChrysler's breach of the service contract by its failure to repair the automobile after a reasonable number of times. Civil Code section 1794, subdivision (b)(2) provides that "[w]here the buyer has accepted the goods, Sections 2714 and 2715 of the Commercial Code shall apply, and the measure of damages shall include the cost of repairs necessary to make the goods conform." California Uniform Commercial Code section 2714, subdivision (2) provides as follows: "The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount." Although DaimlerChrysler's service contract limited remedies to the cost of repairs or

replacement if less than the cost of repairs, California Uniform Commercial Code section 2719, subdivision (2) provides that alternative remedies may be sought if the remedy provided by contract "fail[s] of its essential purpose."

■ Gavaldon raised the diminution of value issue late in the trial when it became apparent that the trial court was inclined to rule against her on the express warranty issue. Gavaldon did not raise the diminution of value argument in the Court of Appeal, instead taking the position that breach of the service contract should yield a refund of the service contract price, a position she did not take at trial. The Court of Appeal briefly referred to the diminution of value issue in dicta. As a general rule, we address only issues that have been raised in the Court of Appeal. (*Cedar Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 6 [74 Cal.Rptr.2d 248, 954 P.2d 511].) Although we sometimes depart from that rule, we decline to do so in this case, in which resolution of the issue depends upon a developed evidentiary record and the issue was a subsidiary one scarcely litigated at trial. (Cf. *ibid.* [court addresses question not raised below of whether to recognize tort of intentional first party spoliation of evidence when it is "an issue of law that does not turn on the facts of this case"].)

### III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

On June 23, 2004, the opinion was modified to read as printed above.