[No. S117370. May 26, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
DARYL RANDLE, Defendant and Appellant.

## COUNSEL

J. Bradley O'Connell, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Robert R. Anderson, Chief Assistant Attorney General, Ronald A. Bass and Gerald A. Engler, Assistant Attorneys General, Stan M. Helman, Eric D. Share and Amy Haddix, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BROWN, J.**—The central question presented by this case is whether one who kills in the actual but unreasonable belief he must protect another person from imminent danger of death or great bodily injury is guilty of voluntary manslaughter, and not murder, because he lacks the malice required for murder. In other words, should California recognize the doctrine of *imperfect defense of others*? We conclude the answer is, yes.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The homicide victim Brian Robinson lived with his parents and his cousin, Charles Lambert. Late one evening, as Robinson drove up to their home, he saw defendant getting out of Lambert's car, holding a large stereo speaker he had just stolen from it.

Robinson confronted defendant, saying he was going to "beat your ass." Defendant pulled a .25-caliber pistol from his pocket and fired it several times. Defendant and his cousin Byron W., who had helped him break into Lambert's car, then fled on foot. Byron retained a backpack full of Lambert's stereo equipment.

Defendant claimed he fired after Robinson "reached for his hip." However, he did not claim he thought Robinson was reaching for a gun or other deadly weapon. Moreover, Byron testified Robinson approached them with a cup or bottle in his hand. Defendant and Byron agreed it was some sort of object made of glass that Robinson threw at them after defendant fired the pistol.

Defendant gave conflicting accounts as to his aim. On the one hand, he claimed he "fired the gun in the air." On the other hand, he earlier testified, "I shot at him."

Defendant testified he heard Robinson say something about getting a gun himself, and that he heard two loud bangs behind them as they fled. Byron testified he also heard gunshots as they ran. There was no evidence to corroborate these claims.

Robinson went into his house and roused Lambert. The two men got into a truck and pursued defendant and Byron. Defendant eluded them, but they caught Byron.

According to Lambert's testimony, he and Robinson took turns beating Byron with their fists. After Byron fell to the ground, Robinson kicked him. Lambert pulled Robinson off Byron. Having recovered the stolen stereo equipment, they returned to the truck. However, Robinson jumped out of the truck and began beating Byron again. As he did, Robinson yelled at Lambert to "get pops," meaning Robinson's father; Lambert drove off to do so. While Lambert was present, the beating of Byron lasted "[p]robably five, ten minutes."

Byron testified his assailants[1] hit and kicked him. One of them stomped on his chest, stepped on his head, and kicked him in the mouth. The beating continued for five minutes. One of the men spoke of putting Byron in the

---

[1] He did not identify Robinson or Lambert.

truck and taking him into the hills. Byron was bleeding from the mouth; his nose was broken. He was hollering his lungs out. He thought he was going to die. He was being beaten when defendant cried out, "Get off my cousin." Byron's assailant continued beating him, and then defendant opened fire. Defendant, Byron believed, saved his life.

Defendant testified he ran away, but then backtracked in search of Byron. He heard someone yelling for help and someone else saying, "I'm going to kill this little nigger." Coming closer, defendant saw someone beating Byron. Defendant shouted, "Stop. Get off my cousin." Byron's assailant glanced at defendant, but then resumed beating Byron. Defendant testified he fired his gun to make the man stop beating Byron.

Two prior statements defendant had made, one to the police and the other to a deputy district attorney, were played for the jury. According to defendant's statement to the police, Robinson was beating Byron when defendant first shot at him. Defendant was, he said, "mainly thinking about getting him off my little cousin." However, defendant admitted shooting at Robinson after Robinson started running away. In his statement to the deputy district attorney, defendant said he warned Robinson to get off Byron, shot once in the air, and then when Robinson did not respond, shot at him. Again, defendant admitted shooting at Robinson while he was running away. Defendant added he ceased firing because he ran out of ammunition.

Sharalyn Lawrence and Jennifer Wellington witnessed the beating from Lawrence's upstairs window. They could see that Byron was "being really hurt." Still, for a couple of minutes they were undecided what they should do. "I am like, this is Oakland," Wellington testified, "what do you do[?]" Finally, hearing Byron cry out, "Somebody help me," Lawrence telephoned 911, reporting a man "getting his ass beat." She said an ambulance should be dispatched. Defendant shot Robinson after Lawrence called 911 to report Byron was being badly beaten.

As previously stated, although defendant and Byron testified Robinson was still beating Byron when defendant fired the shots, defendant, in his statements to the police and the deputy district attorney, said he fired one shot at Robinson while Robinson was running away. The testimony of Wellington and Lawrence tends to support the view that defendant shot at Robinson after Robinson stopped beating Byron and while he was running away. Wellington so testified, and Lawrence's testimony, while not very clear on this point, suggested that at least some of the shots were fired as Robinson was running away.

The cause of Robinson's death was a bullet wound in the abdomen. The bullet was a .25 caliber. It entered Robinson's lower right chest or upper abdomen and lodged in the left side of his abdomen. Robinson was not wounded in the back.

At trial, defendant asked for an instruction on imperfect defense of another. The trial court denied the request. After deliberating five days, the jury convicted defendant of second degree murder (Pen. Code, §§ 187, 189)[2] and automobile burglary (§ 459). The jury also sustained firearm use allegations on both the murder count (§ 12022.53, subd. (d)) and the automobile burglary count (§ 12022.5, subd. (a)). Defendant was sentenced to a term of 40 years to life imprisonment. This timely appeal followed.

Holding the trial court erred in refusing to instruct on imperfect defense of another, the Court of Appeal reversed the judgment convicting defendant of second degree murder. The Court of Appeal remanded the cause for a new trial on that count; in all other respects, it affirmed the judgment.

We conclude the trial court prejudicially erred in refusing to instruct the jury on the doctrine of imperfect defense of others.

Moreover, we conclude it was error, under the circumstances of this case, for the trial court to instruct the jury that defendant could be found guilty of second degree felony murder if the killing was committed in the course of discharging a firearm in a grossly negligent manner in violation of section 246.3. (*People v. Robertson* (2004) 34 Cal.4th 156, 171 [17 Cal.Rptr.3d 604, 95 P.3d 872] (*Robertson*).) Unlike the defendant in *Robertson*, defendant admitted shooting at Robinson. Therefore, the collateral purpose exception to the merger doctrine is inapplicable. (*Ibid.*)

Accordingly, we affirm the judgment of the Court of Appeal, reversing the trial court judgment insofar as it convicted defendant of second degree murder, and we remand the cause for further proceedings consistent with the views expressed herein.

## II. DISCUSSION

### A. *Imperfect Defense of Others*

Again, the central question presented by this case is whether one who kills in the actual but unreasonable belief he must protect another person from imminent danger of death or great bodily injury is guilty of voluntary manslaughter, and not murder, because he lacks the malice required for murder.

---

[2] All further statutory references are to the Penal Code.

Defendant contends such a person is guilty, under the doctrine of imperfect defense of others, of only voluntary manslaughter, and that the trial court prejudicially erred in refusing his request to instruct the jury on the doctrine.

The Attorney General contends (1) California has not recognized the doctrine of imperfect defense of others; (2) even assuming California does recognize the doctrine, defendant was not entitled to invoke it because he created the circumstances leading to the killing; and (3) in any event, any error in refusing to give the requested instruction was harmless here.

### 1. *Whether California recognizes the doctrine*

■ We begin by reviewing the related concepts of *self-defense* and *defense of others*. Self-defense is *perfect* or *imperfect*. For perfect self-defense, one must actually *and* reasonably believe in the necessity of defending oneself from imminent danger of death or great bodily injury. (*People v. Flannel* (1979) 25 Cal.3d 668, 674 [160 Cal.Rptr. 84, 603 P.2d 1] (*Flannel*).) A killing committed in perfect self-defense is neither murder nor manslaughter; it is justifiable homicide. (§ 197; *People v. Anderson* (2002) 28 Cal.4th 767, 782 [122 Cal.Rptr.2d 587, 50 P.3d 368] (*Anderson*).)

■ "One acting in imperfect self-defense also actually believes he must defend himself from imminent danger of death or great bodily injury; however, his belief is unreasonable. (*In re Christian S.* (1994) 7 Cal.4th 768, 771 [30 Cal.Rptr.2d 33, 872 P.2d 574] (*Christian S.*); *Flannel, supra,* 25 Cal.3d at p. 674.) Imperfect self-defense mitigates, rather than justifies, homicide; it does so by negating the element of malice. (*People v. Rios* (2000) 23 Cal.4th 450, 461 [97 Cal.Rptr.2d 512, 2 P.3d 1066] (*Rios*); *Flannel, supra,* 25 Cal.3d at p. 679.)

■ "California statutes have long separated criminal homicide into two classes, the greater offense of murder and the lesser included offense of manslaughter. The distinguishing feature is that murder includes, but manslaughter lacks, the element of malice. (Compare § 187, subd. (a) ['[m]urder is the unlawful killing of a human being . . . with malice aforethought'] with § 192 ['[m]anslaughter is the unlawful killing of a human being without malice'].)

■ "Malice exists, if at all, only when an unlawful homicide was committed with the 'intention unlawfully to take away the life of a fellow creature' (§ 188), or with awareness of the danger and a conscious disregard for life (*ibid.*; *People v. Whitfield* (1994) 7 Cal.4th 437, 450 [27 Cal.Rptr.2d 858, 868 P.2d 272]; see also *People v. Watson* (1981) 30 Cal.3d 290, 300

[179 Cal.Rptr. 43, 637 P.2d 279] ['wanton disregard for human life']).[3] In certain circumstances, however, a finding of malice may be precluded, and the offense limited to manslaughter, even when an unlawful homicide *was* committed with intent to kill. In such a case, the homicide, though not murder, can be no less than voluntary manslaughter." (*Rios, supra*, 23 Cal.4th at p. 460.)

 "Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually,* but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*Christian S., supra*, 7 Cal.4th at p. 771.) "*Imperfect self-defense* obviates malice because that most culpable of mental states 'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand. [Citations.]" (*Rios, supra*, 23 Cal.4th at p. 461.)

Defendant contends defense of others, like self-defense, has an imperfect form. That is, defendant contends, if a killing is committed by someone who actually but unreasonably believes he is acting under the necessity of defending another person from imminent danger of death or great bodily injury, then the killing is voluntary manslaughter, not murder, because the killer is not acting with malice.

Defendant relies on our recent opinion in *People v. Michaels* (2002) 28 Cal.4th 486 [122 Cal.Rptr.2d 285, 49 P.3d 1032] (*Michaels*). In *Michaels*, the defendant confessed to killing his girlfriend's mother JoAnn, but claimed he did so to protect his girlfriend Christina from JoAnn's physical and sexual abuse, which, Christina told the defendant, was driving her to suicide. (*Id.* at p. 501.) On appeal from his first degree murder conviction, the defendant contended the trial court should have instructed the jury, on its own motion, on the doctrine of imperfect defense of others.

The doctrine was, we noted, of "doubtful" applicability, given the facts of the case. "Defendant's problem is that both self-defense and defense of others

---

[3] "Not all murder requires the People to prove the defendant killed intentionally or with conscious disregard for life. Under the felony-murder rule, a homicide is murder when it occurs in the course of certain serious and inherently dangerous felonies (§ 189 [first degree felony murder]; see, e.g., *People v. Patterson* (1989) 49 Cal.3d 615, 626 [262 Cal.Rptr. 195, 778 P.2d 549] . . . [nonstatutory second degree felony murder].) In such cases, the intent to commit a dangerous felony that actually results in death is substituted for malice, thus establishing the extent of culpability appropriate to murder. (*Patterson, supra*, 49 Cal.3d at p. 626; see also *People v. Dillon* (1983) 34 Cal.3d 441, 474–476 [194 Cal.Rptr. 390, 668 P.2d 697].) The felony-murder doctrine is not pertinent to the discussion here." (*Rios, supra*, 23 Cal.4th at p. 461, fn. 6.)

requires a fear of *imminent* harm (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 [56 Cal.Rptr.2d 142, 921 P.2d 1]), so presumably imperfect self-defense or imperfect defense of others would require an unreasonable belief that harm was imminent. But when defendant committed the homicide, Christina was at Broad Horizons, a youth detention facility, and murder victim JoAnn was asleep in her apartment. The record does not indicate when Christina would next be released to visit JoAnn, but even if it was the next day it is doubtful that the facts would show that defendant believed, reasonably or unreasonably, that any threatened danger to Christina was 'imminent.' " (*Michaels, supra,* 28 Cal.4th at pp. 530–531.)

Nevertheless, we addressed the defendant's contention that the trial court had a sua sponte duty to instruct on the doctrine. "The doctrine of unreasonable or imperfect defense of others, in contrast to the doctrine of unreasonable or imperfect self-defense, is not well established in California law. It has been recognized in only one decision, *People v. Uriarte* (1990) 223 Cal.App.3d 192, 198 [272 Cal.Rptr. 693], and there the court found the doctrine inapplicable because Uriarte did not present evidence that he believed (reasonably or unreasonably) that the asserted danger to his wife was imminent or that shooting the victims was necessary to rescue her. *Uriarte* was decided two months after this case was tried. Thus at the time of the trial here, there was no California authority recognizing a doctrine of imperfect defense of others." (*Michaels, supra,* 28 Cal.4th at p. 529.)

Because the defense of imperfect defense of others was not, at the time of the *Michaels* trial, a well-established doctrine under California law, we held the trial court was not required to instruct the jury on the defense on its own motion. However, we acknowledged the doctrine "follows logically from the interplay between statutory and decisional law. Section 197 provides that '[h]omicide is . . . justifiable when committed by any person . . . [¶] . . . [w]hen resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person.' " (*Michaels, supra,* 28 Cal.4th at p. 530.) Accordingly, we observed, "[i]nnovative counsel could view that statute in light of *Flannel*'s analysis of imperfect self-defense (see *People v. Flannel, supra,* 25 Cal.3d at pp. 674–680), and propose an instruction on imperfect defense of others." (*Michaels,* at p. 530.)

■ Again, as we said in *Michaels,* the doctrine of imperfect defense of others "follows logically from the interplay between statutory and decisional law." (*Michaels, supra,* 28 Cal.4th at p. 530.) The doctrine is based on statute in that (1) malice is required for murder (§ 187) and (2) perfect self-defense and perfect defense of others are complete defenses to charges of murder (§ 197). One who kills in imperfect self-defense—in the actual but unreasonable belief he must defend himself from imminent death or great bodily

injury—is guilty of manslaughter, not murder, *because he lacks the malice required for murder.* (*Anderson, supra,* 28 Cal.4th at p. 782; *Christian S., supra,* 7 Cal.4th at p. 771.) For the same reason, one who kills in imperfect defense of others—in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury—is guilty only of manslaughter.

The Attorney General contends that, contrary to *Michaels,* California has rejected the doctrine of imperfect defense of others. California has done so, the Attorney General argues, by treating the reasonableness requirement differently for self-defense than for defense of others. In self-defense, the Attorney General notes, reasonableness is determined from the point of view of a reasonable person in the defendant's position. The jury must consider all the facts and circumstances it might expect to operate on the defendant's mind. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065 [56 Cal.Rptr.2d 133, 920 P.2d 1337]; *People v. Humphrey, supra,* 13 Cal.4th at p. 1083.) In defense of others, the Attorney General asserts, reasonableness is determined, not from the point of view of the defendant, but rather from the point of view of the person the defendant was seeking to defend. That is, the California rule for defense of others, the Attorney General argues, is the alter ego rule, under which one who attempts to defend another person steps into the shoes of the other person, and so acts at his peril if that person was in the wrong.

The Attorney General bases his argument on his construction of section 197, on his interpretation of the case law, and on his reading of public policy. He is, we conclude, mistaken in every respect.

a. *Section 197*

Section 197 provides in pertinent part: "Homicide is also justifiable when committed by any person in any of the following cases: 1. When resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; [¶] . . . [¶] 3. When committed in the lawful defense of such person, or of a wife or husband, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed."

Section 197, the Attorney General argues, impliedly rejects the doctrine of imperfect defense of others. His argument runs as follows: The statutory basis of the doctrine of self-defense is subdivision 3, while the statutory basis of

the doctrine of defense of others is subdivision 1. Section 197, subdivision 3 expressly incorporates a reasonable person standard: "when there is *reasonable ground to apprehend* a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished . . . ." (Italics added.) Since subdivision 1 does not expressly incorporate such a reasonableness standard, the Attorney General argues, the Legislature must have intended, with regard to defense of others, to adopt the alter ego rule.

A problem with the Attorney General's argument is that section 197 does not compartmentalize the doctrines of self-defense and defense of others as neatly as that. Subdivision 1, which the Attorney General characterizes as the defense-of-others provision, may also be read as including self-defense. No reason appears why the phrase "any person," which occurs both in the stem of section 197 and in subdivision 1, would not cover oneself as well as others. Under section 197, subdivision 1, a homicide is justifiable when committed by "any person" "resisting any attempt to murder *any person*, or to commit a felony, or to do some great bodily injury upon *any person*." (Italics added.)

On the other hand, subdivision 3, which the Attorney General characterizes as the self-defense provision, also expressly covers the defense of others, albeit others in specified relationships with the person who comes to their defense. Under this provision, a homicide is justifiable when committed by any person "in the lawful defense of such person, *or of a wife or husband, parent, child, master, mistress, or servant of such person*, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished . . . ." (§ 197, subd. 3, italics added.)

Moreover, the Attorney General's argument—that the Legislature must have intended to adopt the alter ego rule for defense of others because it did not expressly incorporate a reasonable person standard in subdivision 1—finds no support in the legislative history of section 197.

Section 197, enacted in 1872, was based on the Crimes and Punishment Act of 1850. Under the Crimes and Punishment Act, a reasonable person standard governed defense of others as well as self-defense. Both of the defenses were covered by section 29. "Justifiable homicide is the killing of a human being *in necessary self-defence, or in defence of habitation, property, or person,* against one who manifestly intends or endeavors, by violence or surprise, to commit a felony . . . ." (Stats. 1850, ch. 99, § 29, p. 232, italics added.) The applicability of the reasonable person standard to section 29 was made clear in the next section. "A bare fear of any of these offences, to prevent which the homicide is alleged to have been committed, shall not be

sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of *a reasonable person*, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge." (Stats. 1850, ch. 99, § 30, p. 232, italics added.) There is no reason to believe the Legislature, by enacting section 197, intended to substitute the alter ego standard for the reasonable person standard with regard to defense of others. To the contrary, the code commissioners noted: "The commission have modified the language [of specified sections of the Crimes and Punishment Act of 1850], making it accord, in many respects, with that of the New York Penal Code [Field's Draft] §§ 260, 261, and 262. *The legal effect, however, has not been changed.*" (Code commrs. note foll. Deering's Ann. Pen. Code, § 197 (1985 ed.) p. 163, italics added.)

### b. *Case law*

The Attorney General also misreads our cases. He asserts: "Early California cases observe that one who kills in the defense of another steps into the shoes of the person defended for purposes of evaluating a claim that homicide was justified. 'A person interfering in a difficulty in behalf of another simply steps in the latter's shoes; he may lawfully do in another's defense what such other might lawfully do in his own defense but no more . . . .' (*People v. Will* (1926) 79 Cal.App. 101, 114 [248 P. 1078] [(*Will*)], citing *People v. Travis* (1880) 56 Cal. 251, 256 [(*Travis*)] . . . ."

By calling to our attention the fact that *Will* cites *Travis*, the Attorney General implies that our decision in *Travis* supports the passage he quotes from the Court of Appeal's opinion in *Will*. However, it does not. In *Travis*, Wirt Travis was convicted of manslaughter for killing A.G. Hill. Wirt, along with his sister Georgia and their brother John, attended a social function also attended by Hill. Georgia walked out, explaining to Wirt that she could not remain in the hall with Hill because he had impugned her virtue. Wirt so informed his brother John. The two of them went back into the hall and took seats apart from one another but near Hill. John hit Hill. Hill drew a pistol on John. Wirt then shot Hill in the back, killing him. (*Travis, supra*, 56 Cal. at pp. 252–253.)

Wirt claimed he acted in defense of John, believing Hill was about to shoot John. His claimed fear had some basis. A witness testified that Hill had previously told him, "the first thing he was going to do with them boys [the Travis brothers], he would commence killing them, if he got in a row with them." (*Travis, supra*, 56 Cal. at p. 252.) While the witness did not tell the Travises of Hill's threat against them, they may well have heard of it because the witness had told "fifty or sixty [other] people" (*ibid.*), and word like that presumably traveled fast in Forestville in 1878.

Contrary to the Attorney General's argument, *Travis* does *not* stand for the proposition that the reasonableness of a claim of defense of others is tested from the point of view of the person the defendant was seeking to defend. Indeed, in *Travis*, we upheld a jury instruction to the effect that Wirt's killing of Hill would have been justifiable if the jury had found that Wirt shot Hill in order to prevent Hill from shooting John, "if that was necessary to prevent [Hill] from executing his design; provided there was, *or appeared to the defendant to be*, imminent danger to the life or limb of his brother from the hostile and threatening attitude of Hill." (*Travis, supra*, 56 Cal. at p. 256, italics added.) John was closely related to Wirt. However, their relationship as brothers was not one of the relationships specified in subdivision 3 of section 197, in that John was not Wirt's "wife or husband, parent, child, master, mistress, or servant."[4] Nevertheless, we upheld a jury instruction that focused on Wirt's point of view, and not upon the point of view of the brother he was seeking to defend.

*People v. Will, supra*, 79 Cal.App. 101, is disapproved insofar as it is inconsistent with the views expressed herein.

### c. *Public policy*

The Attorney General's public policy argument is that the doctrine of imperfect self-defense is "an open invitation to assaults, not just upon undercover officers effectuating arrests, but upon innocent bystanders in many

---

[4] Perkins explains the origins and evolution of such catalogues of relationships in statutory provisions covering self-defense and defense of others. "The privilege of using force in defense of others, as a separate privilege, developed partly by accident. It had its roots in the law of property. The privilege of one to protect what was 'his' was extended to include the protection of his wife, his children and his servants. In the course of time this privilege outgrew the property analogy and came to be regarded as a 'mutual and reciprocal defence.' The household was regarded as a group, any member of which had a privilege to defend any other member. 'A man may defend his family, his servants or his master, whenever he may defend himself.' Even this concept of the privilege was outgrown and it came to include the members of one's immediate family or household and any other 'whom he is under a legal or socially recognized duty to protect.' Thus a conductor was privileged to defend his passenger, and a man privileged to defend a lady friend whom he was escorting at the moment. The present position, which represents a merging of the privilege of crime prevention with the privilege of defending others, is that one may go to the defense of a stranger if that person is the innocent victim of an unlawful attack." (Perkins & Boyce, Criminal Law (3d ed. 1982) Self-Defense, § 5, pp. 1144–1145, fns. omitted.)

While acknowledging some courts had adopted the alter ego rule, Perkins states the "sound" view was that one coming to the defense of others "is protected by the usual mistake-of-fact doctrine and may act upon the situation as it reasonably seems to be." (Perkins & Boyce, Criminal Law, *supra*, § 5, p. 1147, fn. omitted.) He adds: "Most of the codes that deal separately with the defense of another seem to leave no trace of the view that one who goes to the aid of another 'acts at his peril' with reference to the right of that person to receive such aid . . . ." (*Id.*, p. 1148, fn. omitted.)

situations not the least of them being mob violence and gang warfare." However, the controlling public policy decision here was made by the Legislature when it decided the unlawful killing of a human being without malice is manslaughter, not murder. (§ 192.)

### 2. *Whether defendant may invoke the doctrine*

The Attorney General, relying on *Christian S.*, *supra*, 7 Cal.4th 768, contends defendant is not entitled to invoke the doctrine of imperfect defense of others because he created the circumstances leading to the killing. In *Christian S.*, we observed, "It is well established that the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e. g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances. For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense." (*Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1.)

Defendant contends the Attorney General is barred from raising this argument because he did not raise it in the Court of Appeal. The Attorney General responds the argument was "implicit" in his Court of Appeal brief. We disagree. Fairly read, the Attorney General's brief in the Court of Appeal is limited to the argument we discussed earlier, that contrary to *Michaels*, *supra*, 28 Cal.4th 486, California has rejected the doctrine of imperfect defense of others, and has, instead, adopted the alter ego rule.

■ However, this issue, whether defendant is precluded from invoking the doctrine of defense of others because he created the circumstances leading to the killing, was squarely raised in the Attorney General's petition for review, which we granted. We may decide any issue raised or fairly included in the petition or answer. (Cal. Rules of Court, rule 29(b)(1).) The Attorney General urges us to exercise our discretion to decide this issue.

■ As a matter of policy, we generally will not consider on review any issue which could have been, but was not, timely raised in the Court of Appeal. (Cal. Rules of Court, rule 28(c)(1); *Gavaldon v. DaimlerChrysler Corp.* (2004) 32 Cal.4th 1246, 1265 [13 Cal.Rptr.3d 793, 90 P.3d 752].) However, "[i]n a number of cases, this court has decided issues raised for the first time before us, *where those issues were pure questions of law, not turning upon disputed facts*, and were pertinent to a proper disposition of the

cause or involved matters of particular public importance. (E.g., *Temple Community Hospital v. Superior Court* (1999) 20 Cal.4th 464, 469, fn. 2 [84 Cal.Rptr.2d 852, 976 P.2d 223]; *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 7–8, fn. 2 [74 Cal.Rptr.2d 248, 954 P.2d 511]; *Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1118 [245 Cal.Rptr. 658, 751 P.2d 923]; *Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 654 & fn. 3 [209 Cal.Rptr. 682, 693 P.2d 261].)" (*People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 901, fn. 5 [119 Cal.Rptr.2d 1, 44 P.3d 949], italics added.)

The facts underlying the Attorney General's argument were undisputed. Defendant admitted arming himself with a pistol when he and Byron set out to burglarize cars, and he admitted using the weapon when Robinson surprised him in the act of burglarizing Lambert's car. Therefore, we conclude the Attorney General is not barred, by his failure to raise it below, from arguing that defendant is not entitled to invoke the doctrine of imperfect defense of others because he created the circumstances leading to the killing.

Turning to the merits, we agree with defendant.

The Attorney General's argument fails because although defendant's criminal conduct certainly set in motion the series of events that led to the fatal shooting of Robinson, the retreat of defendant and Byron and the subsequent recovery of the stolen equipment from Byron extinguished the *legal justification* for Robinson's attack on Byron. (See *Christian S., supra,* 7 Cal.4th at p. 773, fn. 1.)

The record supports the conclusion that Robinson was taking the law into his own hands, meting out the punishment he thought Byron deserved, and not making a citizen's arrest as the Attorney General claims.[5] While Robinson may well have had a right to pursue Byron for the purpose of recovering Lambert's stolen property, and to use reasonable force to retrieve it,[6] the

---

[5] Had Robinson and Lambert been attempting to effect a citizen's arrest, the use of reasonable force may have been permitted. (§§ 835, 837; *People v. Fosselman* (1983) 33 Cal.3d 572, 579 [189 Cal.Rptr. 855, 659 P.2d 1144].) However, none of the witnesses, not even Lambert, suggested the beating was incidental to a citizen's arrest. Indeed, Lambert testified that Robinson, in renewing the beating, yelled at him to "get pops," not "get the police." According to Byron, one of his assailants spoke of taking him, not to a police station, but into the hills. According to defendant, someone said, "I'm going to kill this little nigger."

[6] See, e.g., *People v. Young* (1963) 214 Cal.App.2d 641 [29 Cal.Rptr. 595]. "In this case defendant's money was snatched from his hand so quickly that no particular force was required and no fear engendered upon the instant, but mere demand for return of the money brought forth the opened knife and the threat to cut defendant's head off and he was in fear for his life; 'I was always afraid of him.' In these circumstances the California cases make it plain that the victim has a right to use reasonable force to recover his money and, if actually or apparently reasonably necessary, to kill the robber in so doing." (*Id.* at p. 648.)

beating of Byron by Robinson and Lambert went well beyond any force they were entitled to use. Moreover, after they recovered the stolen stereo equipment and returned to their truck, Robinson jumped out of the truck and began beating Byron again. At that point Robinson's use of force was completely unjustified, and it was at that point, or shortly thereafter, that defendant shot Robinson.

While we hold defendant's conduct did not create circumstances legally justifying Robinson's attack on Byron, we should not be understood as condoning it in any respect. By making two fateful choices defendant triggered an escalating series of events that transformed the most mundane of property crimes into a fatal shooting. When he set out to burglarize cars, defendant chose to arm himself. When he was surprised in the act of burglary, defendant chose to use the weapon. Whether, during that initial confrontation, he fired the pistol at Robinson, or fired in the air, as he variously testified, he raised the stakes enormously.

### 3. *Whether refusal to instruct on the doctrine was harmless*

The Attorney General contends that, even assuming arguendo the trial court erred in failing to instruct on the doctrine of imperfect defense of others, the error was harmless.

■ Any error in failing to instruct on imperfect defense of others is state law error alone, and thus subject, under article VI, section 13 of the California Constitution, to the harmless error test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. "Did defendant suffer prejudice from the trial court's failure to instruct the jury that an unintentional killing in unreasonable self-defense is involuntary manslaughter? A majority of this court recently held that when, as in this case, a trial court violates state law by failing to properly instruct the jury on a lesser included offense, the following test applies: '[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*Watson*]. A conviction of the charged offense may be reversed in consequence of this form of error only if, "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred (*Watson*, [at p. 836].)' (*People v. Breverman*, [(1998)] 19 Cal.4th 142, 178 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)" (*People v. Blakeley* (2000) 23 Cal.4th 82, 93 [96 Cal.Rptr.2d 451, 999 P.2d 675].)

 Is it reasonably probable a result more favorable to defendant would have been reached had the trial court instructed the jury on imperfect defense of others? This is a close question, but on balance, we agree with defendant.

The thrust of defendant's testimony was that he acted in *perfect* defense of another. He claimed he shot at Robinson in the *reasonable* belief he had to do so in order to protect Byron from imminent danger of death or great bodily injury. However, the evidence was also susceptible of the interpretation that defendant's belief in the necessity of protecting Byron, supposing he held such a belief, was *unreasonable* because Byron was not really in imminent danger of death or great bodily injury. Indeed, the prosecutor argued to the jury that Bryon was not being beaten that badly; Byron did not, the prosecutor noted, seek any medical treatment for the injuries he claimed to have suffered. Under this view of the evidence, defendant was entitled to an instruction on imperfect defense of others. In concluding the failure to give the instruction was prejudicial, we note the jury, even without having been instructed on this theory, took five days to reach its decision.

B. *Section 246.3 and the Merger Doctrine*

The instructions permitted the jury to convict defendant of second degree murder on three theories: express malice, implied malice, and felony murder. The felony-murder theory was based on defendant's having discharged a firearm in a grossly negligent manner (§ 246.3). Defendant contends it was error to instruct on felony murder because the offense of discharging a firearm in a grossly negligent manner here necessarily *merged* with the homicide.

 In *People v. Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580], "we held that the trial court erred in instructing the jury on second degree felony murder based on the crime of assault with a deadly weapon. The defendant's crime of assault with a deadly weapon merged with a resulting homicide and could not form the basis for an application of the second degree felony-murder rule. The instructional error was prejudicial because . . . malice is not an element of second degree felony-murder and therefore the felony-murder instruction in the *Ireland* case permitted the jury to disregard the defendant's diminished capacity defense. (*Id.* at p. 539 & fn. 13.) We observed that '[t]o allow such use of the felony murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as the result of felonious assault—a category which includes the great majority of all homicides.' (*Id.* at p. 539.) The felony-murder instruction is not proper when the predicate felony is an 'integral part of the homicide'and when, under the prosecution's evidence, it is 'included in fact within the offense charged.' (*Id.* at p. 539, italics omitted.)" (*Robertson, supra,* 34 Cal.4th at p. 169.)

In *Robertson*, as in this case, the question presented was "whether the trial court erred by instructing the jury that defendant could be found guilty of second degree felony murder if the killing was committed in the course of discharging a firearm in a grossly negligent manner in violation of section 246.3." (*Robertson, supra*, 34 Cal.4th at p. 164.) The defendant in *Robertson* claimed he fired into the air, in order to frighten away several men who were burglarizing his car. (*Ibid.*) However, the testimony of a neighbor, as well as ballistics evidence, indicated the defendant shot at the victim. (*Id.* at p. 162.) This court held the merger doctrine did not apply because the defendant, by his account, had a "collateral purpose" in firing his weapon. "In [*People v. Mattison* (1971) 4 Cal.3d 177 [93 Cal.Rptr. 185, 481 P.2d 193]], we concluded that use of the second degree felony-murder rule was appropriate when the purpose of the predicate felony was independent of or collateral to an intent to cause injury that would result in death. ([*Id.*] at p. 185.) Although the collateral purpose rationale may have its drawbacks in some situations ([*People v.*] *Hansen* [(1994)] 9 Cal.4th [300,] 315 [36 Cal.Rptr.2d 609, 885 P.2d 1022]), we believe it provides the most appropriate framework to determine whether, under the facts of the present case, the trial court properly instructed the jury. The defendant's asserted underlying purpose was to frighten away the young men who were burglarizing his automobile. According to defendant's own statements, the discharge of the firearm was undertaken with a purpose collateral to the resulting homicide, rendering the challenged instruction permissible." (*Robertson*, at p. 171.)

Here, unlike *Robertson*, defendant admitted, in his pretrial statements to the police and to a deputy district attorney, he shot *at* Robinson. Defendant told the police, "And I was like, 'Get off my cousin!' I shot one time in the air, and then they looked up, and I guess they started running. That's when I shot towards them one time." Upon being questioned by a deputy district attorney, defendant gave this account: ". . . I said 'Get off my cousin.' That's when I brandished the pistol and shot one time in the air. And then he just stood there and looked at me like he didn't care so I shot again. [¶] Q. Now when you shot, when you shot the next time where was the gun pointed? [¶] A. It was pointed towards him. [¶] Q. Ok. And then what did the guy do after you shot the second time when it was pointed at him? [¶] A. He ran. [¶] Q. And what did you do after he ran? [¶] A. I fired the gun one last time, he ducked, then he got back up and then when I tried to fire again it was just, the gun wouldn't click. It was out of bullets."

The fact that defendant admitted shooting at Robinson distinguishes *Robertson* and supports application of the merger rule here. Defendant's claim that he shot Robinson in order to rescue Byron simply provided a *motive* for the shooting; it was not a purpose independent of the shooting.

DISPOSITION

The judgment of the Court of Appeal reversed the judgment convicting defendant of second degree murder. The Court of Appeal remanded the cause for a new trial on that count; in all other respects, it affirmed the judgment. We affirm the judgment of the Court of Appeal, and we remand the cause for further proceedings consistent with the views expressed herein.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**BAXTER, J.,** Concurring.—I concur in the opinion of the court, but write separately to clarify the limited role that *In re Christian S.* (1994) 7 Cal.4th 768 [30 Cal.Rptr.2d 33, 872 P.2d 574] (*Christian S.*) plays in this case. In particular, I disagree with Justice Brown that *Christian S.* compels the outcome here. (See conc. opn. of Brown, J., *post*, at p. 1008.)

Here there was evidence showing that the aggression of Brian Robinson exceeded any justifiable response to the criminal conduct defendant and his cousin Byron W. initiated, and that Robinson acted to physically punish Byron when Byron was helpless and posed no threat to anyone. Under these circumstances, *Christian S.* does not categorically bar defendant from invoking the doctrine of imperfect defense of others. (See maj. opn., *ante*, at pp. 1001–1003.) But neither does *Christian S.* logically compel the doctrine's availability in this case, as Justice Brown contends in her concurring opinion.

In *Christian S.*, an opinion I authored, we addressed the question whether the Legislature abrogated the doctrine of imperfect self-defense in 1981 by amending the Penal Code to eliminate the diminished capacity defense.[1] We found the Legislature did not do so, and concluded the doctrine remained intact. As part of a general discussion of the doctrine's limitations, we noted

---

[1] In *Christian S.*, the defendant, a minor, sought review of a judgment making him a ward of the juvenile court after sustaining a petition charging him with second degree murder. The evidence showed that the victim was a so-called skinhead and a possible gang member, and that the defendant began carrying a handgun after the victim's friends had physically and verbally harassed and threatened the defendant for about a year. The victim had blamed the defendant for damaging his truck, and one day he chased the defendant while repeatedly threatening " 'to get him' " and challenging him to fire his weapon. (*Christian S., supra*, 7 Cal.4th at p. 772.) The victim halted his advance each time the defendant pointed his gun at him. Finally, after some additional taunting by the victim, the defendant shot and killed him. (*Ibid.*) Upon finding that the imperfect self-defense doctrine had not been statutorily abrogated, we remanded the matter for further proceedings because the record was ambiguous whether the trial court found the defendant lacked an actual belief in the need for self-defense, or whether the court mistakenly believed the defense was not viable. (*Id.* at pp. 783–784.)

the "well-established" rule that "the ordinary self-defense doctrine . . . may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.]" (*Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1.) After concluding that, "a fortiori, . . . the imperfect self-defense doctrine cannot be invoked in such circumstances," we gave one clear example of its limited availability: "[T]he imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense." (*Ibid.*) Although we also cautioned the imperfect self-defense doctrine was a narrow one, requiring a defendant's *actual* fear of an *imminent* harm (*id.* at p. 783), we had no need and made no effort to otherwise define the parameters of the doctrine.

Unlike the instant case, *Christian S.* did not involve any criminal conduct initiated by the defendant. Neither did it concern any claim of perfect or imperfect defense of others. Moreover, the decision did not purport to set forth all the circumstances under which a defendant may or may not assert the doctrine of imperfect self-defense. In sum, *Christian S.* did not recognize, or refuse to recognize, the imperfect defense of others doctrine, and did not address possible restrictions to the imperfect self-defense doctrine other than to note the one obvious example above. Accordingly, that decision does not *compel* the result here. (See *People v. Scheid* (1997) 16 Cal.4th 1, 17 [65 Cal.Rptr.2d 348, 939 P.2d 748] [referencing the familiar rule that language in an opinion is to be understood in light of the facts and the issue then before the court].)

That said, I concur in the court's conclusion that nothing we said in *Christian S.* prohibits defendant here from invoking the imperfect defense of others doctrine. (See maj. opn., *ante*, at pp. 1001–1003.) Although defendant's initial criminal conduct in brandishing and shooting a firearm may well have provoked anger and fear in Robinson, there appears substantial evidence that Robinson exceeded any justifiable response when, after catching up to and physically attacking Byron the first time, Robinson returned to the obviously helpless Byron a second time to resume beating him.

Although I believe our holding is consistent with the restrictions thus far recognized for the analogous doctrine of imperfect self-defense, I join Justice Brown in her call for the Legislature to provide clear definitions of malice, and to reexamine the issues of whether and to what extent a defendant may invoke the doctrines of imperfect self-defense and imperfect defense of others. (See conc. opn. of Brown, J., *post*, at p. 1010; *People v. Wright* (2005) 35 Cal.4th 964, 985–986 [28 Cal.Rptr.3d 708, 111 P.3d 973] (conc. opn. of Brown, J.).) To the extent the

doctrines are legislatively approved in some form, it would be particularly beneficial to have legislative guidance regarding: (1) the type and nature of criminal conduct, whether violent or otherwise, that might preclude a defendant from invoking one or both doctrines; and (2) considerations for determining the duration that a defendant's criminal conduct bars either doctrine's availability.

**BROWN, J.,** Concurring.—I concur in the judgment and opinion of the court.

I write separately because the outcome of this case, although logically compelled by this court's earlier decision in *In re Christian S.* (1994) 7 Cal.4th 768, 771 [30 Cal.Rptr.2d 33, 872 P.2d 574] (*Christian S.*), seems to me unjust. If I were writing on a clean slate, I would not permit defendant to take advantage of the fact that his victim Robinson exceeded the bounds of a lawful citizen's arrest.

In *Christian S.*, we observed, "It is well established that the ordinary self-defense doctrine—applicable when a defendant *reasonably* believes that his safety is endangered—may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. [Citations.] It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances. For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing police officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense." (*Christian S., supra,* 7 Cal.4th at p. 773, fn. 1.)

There is no question but that defendant, by his felonious acts, set in motion the events resulting in his killing of Robinson. "By making two fateful choices defendant triggered an escalating series of events that transformed the most mundane of property crimes into a fatal shooting. When he set out to burglarize cars, defendant chose to arm himself. When he was surprised in the act of burglary, defendant chose to use the weapon. Whether, during that initial confrontation, he fired the pistol at Robinson, or fired in the air, as he variously testified, he raised the stakes enormously." (Maj. opn., *ante,* at p. 1003.)

However, under *Christian S.*, defendant may invoke the doctrine of imperfect defense of others because Robinson's attack on Byron was *not legally justified.* "The Attorney General's argument fails because although defendant's criminal conduct certainly set in motion the series of events that led to the fatal shooting of Robinson, the retreat of defendant and Byron and

the subsequent recovery of the stolen equipment from Byron extinguished the *legal justification* for Robinson's attack on Byron." (See *Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1.)

"The record supports the conclusion that Robinson was taking the law into his own hands, meting out the punishment he thought Byron deserved, and not making a citizen's arrest as the Attorney General claims. While Robinson may well have had a right to pursue Byron for the purpose of recovering Lambert's stolen property, and to use reasonable force to retrieve it, the beating of Byron by Robinson and Lambert went well beyond any force they were entitled to use. Moreover, after they recovered the stolen stereo equipment and returned to their truck, Robinson jumped out of the truck and began beating Byron again. At that point Robinson's use of force was completely unjustified, and it was at that point, or shortly thereafter, that defendant shot Robinson." (Maj. opn., *ante*, at pp. 1002–1003, fns. omitted.)

The paradigm for permitting imperfect defense of others is a case like that of Kitty Genovese[1]—a case where someone is being attacked and a third party has to decide whether to intervene without knowing the full context. In such a circumstance, there is good reason to be more lenient with a misperception or misjudgment. In my view, however, we should never allow a felon whose felonious activity sets off a series of tragic (and ultimately fatal) events to claim partial exoneration—particularly if he murders in defense of a crime partner.

The Legislature has made a policy decision that felons who break into homes or businesses cannot sue for compensation. (Civ. Code, § 847.) Similarly, the Legislature enacted the Home Protection Bill of Rights in 1984 " 'to permit residential occupants to defend themselves from intruders without fear of legal repercussions, to give "the benefit of the doubt in such cases to the resident . . . ." ' [Citation.]" (*People v. Hardin* (2000) 85 Cal.App.4th 625, 633 [102 Cal.Rptr.2d 262].) In other words those who do not play by the rules should not receive the benefit of the rules. In the same vein, the law should preclude reliance on imperfect defense of others by miscreants whose misjudgments lead to the death of their victim.

For the Attorney General, the specter raised by the doctrine of imperfect defense of others extends far beyond the circumstances presented by a case like this: "A judicially created doctrine of unreasonable defense of others would be an open invitation to assaults, not just upon undercover officers effectuating arrests, but upon innocent bystanders in many situations not the

---

[1] See Gansberg, *37 Who Saw Murder Didn't Call the Police*, N.Y. Times (Mar. 27, 1964) p. A1.

least of them being mob violence and gang warfare." Indeed, members of violent street gangs, for whom manslaughter convictions would be little deterrent since they spend most of their lives in prison in any event, might well provoke violence in order to have a license to kill.[2]

As the Attorney General observes, imperfect defense of others, like imperfect self-defense, is a judicially created doctrine. (See *People v. Rios* (2000) 23 Cal.4th 450, 465 [97 Cal.Rptr.2d 512, 2 P.3d 1066].) I have elsewhere urged the Legislature to provide clear definitions of malice and imperfect self-defense. (*People v. Wright* (2005) 35 Cal.4th 964, 985–986 [28 Cal.Rptr.3d 708, 111 P.3d 973] (conc. opn. of Brown, J.).) For the reasons stated above, the derivative doctrine of imperfect defense of others should also be reexamined.

---

[2] That may have been the game the Travis brothers were playing in *People v. Travis* (1880) 56 Cal. 251. (Maj. opn., *ante*, at pp. 999–1000.)