Filed 11/14/13  P. v. Tafoya CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALFREDO DANIEL TAFOYA,<br><br>    Defendant and Appellant. | C070739<br><br>(Super. Ct. No. 09F08863) |

A jury rejected defendant Alfredo Daniel Tafoya's imperfect self-defense or defense of another and convicted him of the second degree murder of two young men at a quinceañera populated by both Norteño and Sureño gang members.  On appeal, he contends the trial court committed prejudicial error by failing to give a defense instruction on antecedent threats made by Norteños.  We disagree that the modified instruction accepted by defense counsel constituted ineffective assistance of counsel or reversible error.  Because we conclude there was no prejudice, we affirm the judgment.

**FACTS**

Most of the facts recited by the parties are not relevant to the solitary issue on appeal.  There is no dispute that defendant shot Carlos Montes and Efrain Zambrano at a

1

quinceañera in the Estrellita Ballroom in Galt on November 28, 2009. The alleged instructional error relates to imperfect self-defense/defense of another and therefore defendant's unreasonable belief that his friend, Aztek, was at risk of death or great bodily injury. We will describe the relevant facts in response to the Attorney General's contentions that there was no evidence defendant's "attacks on the victims were prompted by his knowledge of the Norte[ñ]o and Sure[ñ]o history," no evidence that " 'historical knowledge of another gang's prior violence or threats' was 'relevant to its determination of his beliefs at the time he acted,' " and no substantial evidence "that antecedent threats by Norte[ñ]o gang members precipitated or factored into [defendant's] actual yet unreasonable beliefs."

In fact, with members of both Norteño and Sureño gangs in attendance at the quinceañera, the record is replete with evidence of gang rivalries, threats, and reactions. The gang expert explained that Sureño gang members are outnumbered four or five to one in the Sacramento area. Defendant kept a crude Sureño manifesto in his composition book that was admitted as evidence at trial. The expert translated many of the entries for the benefit of the jury, which otherwise would have been unable to understand the gang vernacular. Suffice it to say, defendant was well-steeped in the gang culture, hateful toward Norteños, and resolute in his desire to gain respect and to protect his territory.

Uninvited, defendant and Aztek, both sporting blue, showed up at the quinceañera and were admitted. Defendant hid a firearm under his peacoat. He danced with several girls, drank, and appeared tipsy. He talked to another Sureño, Jose Pimentel, and introduced him to a friend in a blue hat. Video cameras at the ballroom captured a lot, but not all, of what happened. A 12-year-old girl also filmed some of the fight that precipitated the shooting.

Defendant danced with Vanessa Garcia, Candy Porras, and Llesenia Calderon. They reported that Aztek was wearing a blue hat, but so were others. Porras testified that someone wearing a red hat approached Aztek saying, "Norte." She saw others approach

2

him, and a fight ensued. Calderon knew that Norteños and Sureños were involved in the fight.

Maribel Aldaco witnessed the fight by the front door. She saw a man in a blue hat throw a gang sign, which appeared to upset others in attendance. She saw gang signs being thrown and believed the argument was gang related.

Carlos Montes reacted to a series of text messages he received from his cousin, who was a Norteño gang member. Montes walked toward the front door as Criss Guerrero followed. They got into an argument with someone, and Montes threw the first punch. Most of the eyewitness testimony suggests that Aztek was the victim. Guerrero grabbed him and put him in a headlock.

Meanwhile, defendant had been sitting across the ballroom. Many of the partygoers gravitated to the fight, as did defendant. He walked across the room and shot Montes and Zambrano. There was evidence to suggest there may have been a second shooter, but defense counsel conceded that defendant shot both victims. Then he ran, discarded the gun, and hid from the police. He was found several days later hiding in a closet.

Defendant's girlfriend, Rocio Ramirez, testified that she drove defendant and Aztek to Galt to try to recover the gun around 2:00 a.m. on November 29, but when they saw a number of police officers they left. Aztek's face was swollen. He told Ramirez he had been jumped and that defendant had shot the two people who jumped him, one in the head and one in the stomach. Both Ramirez and Aztek tried to hide defendant.

A gang expert testified to the culture of gangs in Sacramento and the ongoing rivalry between Norteños and Sureños. He explained that a gang member would be expected to come to the defense of a fellow gang member who was being beaten.

**DISCUSSION**

" 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually,* but unreasonably,

3

believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter.' [Citation.] '*Imperfect self-defense* obviates malice because that most culpable of mental states "cannot coexist" with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand. [Citation.]' [Citation.]" (*People v. Randle* (2005) 35 Cal.4th 987, 995 (*Randle*), overruled on another point by *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)

In *Randle*, the Supreme Court applied the same rationale to imperfect defense of others. In other words, "if a killing is committed by someone who actually but unreasonably believes he is acting under the necessity of defending another person from imminent danger of death or great bodily injury, then the killing is voluntary manslaughter, not murder, because the killer is not acting with malice." (*Randle*, *supra*, 35 Cal.4th at p. 995.)

Defendant requested the following pinpoint instruction: "If you find that the defendant believed that members of the Norte[ñ]o criminal street gang had threatened or harmed others in the past, you may consider that information in evaluating the defendant's beliefs." (Italics omitted.) The court explained on the record that defense counsel had participated in a discussion of the jury instructions, he was satisfied with the changes that were made, and he stipulated to the instructions, including a modified CALCRIM No. 571. According to the stipulation, the jury was instructed:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed a person because he acted in imperfect self-defense or imperfect defense of another.

"If you conclude the defendant acted in complete self-defense or defense of another, his action was lawful and you must find him not guilty of any crime. The difference between complete self-defense or defense of another and imperfect self-

4

defense or imperfect defense of another depends on whether the defendant's belief in the need to use deadly force was reasonable.

"The defendant acted in imperfect self-defense or imperfect defense of another if:

"1.  The defendant actually believed that he or someone else was in imminent danger of being killed or suffering great bodily injury;

"and

"2.  The defendant actually believed that the immediate use of deadly force was necessary to defend against the danger;

"but

"3.  At least one of those beliefs was unreasonable.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be.

"In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.

"If you find that the defendant received a threat from someone else that he reasonably associated with Carlos Alonso Montes and Efrain Zambrano, you may consider that threat in evaluating the defendant's beliefs.

"The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense or imperfect defense of another.  If the People have not met this burden, you must find the defendant not guilty of murder."

On appeal, defendant is no longer satisfied with the modification.  Thus, the case boils down to whether the language "If you find that the defendant received a threat from someone else that he reasonably associated with Carlos Alonso Montes and Efrain Zambrano, you may consider that threat in evaluating the defendant's beliefs" was a sufficient replacement for the language he initially suggested, "If you find that the defendant believed that members of the Norte[ñ]o criminal street gang had threatened or

5

harmed others in the past, you may consider that information in evaluating the defendant's beliefs."

Defendant correctly points out that threats by a group with whom a victim is affiliated are relevant to a defendant's state of mind. As the Supreme Court held in *People v. Minifie* (1996) 13 Cal.4th 1055 (*Minifie*): " 'A person claiming self-defense [or defense of another] is required to "prove his own frame of mind," and in so doing is "entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear." [Citation.] The defendant's perceptions are at issue, and threats from a family and its friends may color a person's perceptions of that group no less than threats from an individual may color a person's perceptions of that individual. A defendant who testifies that he acted from fear of a clan united against him is entitled to corroborate that testimony with evidence "tend[ing] in reason to prove" that the fear was reasonable. [Citation.] Threats from the group on the defendant's life would certainly tend in reason to make the defendant fearful. This is especially true where the group has a reputation for violence, and that reputation is known to the defendant. Such threats are relevant to the defendant's state of mind—a matter "of consequence to the determination of the action" (*ibid*.)—and the trier of fact is entitled to consider those threats along with other relevant circumstances in deciding whether the defendant's actions were justified." (*Minifie*, at pp. 1065-1066.)

We also agree with defendant that the record belies the Attorney General's statements that there is no evidence defendant's knowledge of Norteño members' resorting to violence in the past was relevant to the jury's determination of his belief at the time of the shooting. The Attorney General unduly minimizes the role of the Norteño/Sureño rivalry and the gang behavior that permeated the quinceañera. If, in fact, members of a Norteño gang had made threats against defendant or his friend Aztek, the threats would be relevant to a determination of defendant's belief that he or Aztek was in grave or mortal danger. And the record certainly supports defendant's argument that

6

gang taunts, signs, and customary gang behavior preceded the fight, all of which might have factored into defendant's actual, although unreasonable, belief.

Yet the evidence is not exactly what defendant would have us believe and certainly not of the caliber presented in *Minifie*. In *Minifie*, a member of the " ' "Knight crowd" ' " had killed defendant's friend and defendant had received a threat that he " ' "was next." ' " (*Minifie*, *supra*, 13 Cal.4th at p. 1067.) While the "Knight crowd" may be analogous to the Norteños, defendant does not offer any specific threat he received. The question as to whether his generalized knowledge and understanding of Norteño behavior or even his observations of the gang's taunting at the quinceañera constitute the type of antecedent threat recognized in *Minifie* is debatable. But it is a debate we need not resolve in this case.

Here the antecedent threat issue was telegraphed for the jury, albeit without naming the Norteños but by alerting the jurors that if defendant had received "a threat from someone else that he reasonably associated with Carlos Alonso Montes and Efrain Zambrano, [they could] consider that threat in evaluating the defendant's beliefs." This admonition was in the context of a comprehensive explanation of imperfect self-defense and defense of others. We reject defendant's contention, therefore, that the court committed reversible error by delivering a modified instruction that thereby failed to explain to the jury the essence of his defense.

Moreover, defense counsel argued the "threatening behavior by guys in red," based on defendant's knowledge of "Norte[ñ]o intimidation and threats," meant that "a threat to one gang member is a threat to all." He conceded his "young," "tipsy" client made a "stupid, stupid decision," but he put that decision squarely in the context of "this long history of violence between people that are perceived as gang members." While argument by counsel cannot substitute for omitted instructions, we can consider argument in our assessment of prejudice. Here the testimony by many of the witnesses to the

7

shooting attested to the gang behavior that permeated the quinceañera throughout the evening, including gang taunts, gang signs, and gang colors.

Thus, defendant was not denied his right to present his defense to a properly informed jury, and his lawyer was not constitutionally deficient for acceding to the modified instruction, because we conclude beyond a reasonable doubt that in the absence of the modification of the pinpoint instruction there would not have been a different outcome for defendant. In this case, there is no prejudice even if we assume that the more rigorous evaluation of prejudice under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] applies.

The jury was properly instructed on voluntary manslaughter, including both perfect and imperfect self-defense and defense of another. In addition, they were instructed that they could consider any threats defendant might have received that were associated with the victims. His lawyer put those threats in the context of the long history of gang violence and defendant's knowledge of Norteño threats. As a result, we reject the notion that either the court committed reversible error per se by failing to instruct on an element of the crime or that defendant might have achieved a more favorable outcome if the court had specifically identified threats by Norteños in its instruction on imperfect defense of another. In the absence of prejudice, we affirm the judgment.

## DISPOSITION

The judgment is affirmed.

                RAYE         , P. J.

We concur:


       HULL       , J.


       HOCH       , J.