Filed 10/29/20  P. v. Price CA4/3
(unmodified opinion attached)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | G057277 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 17WF2059) |
| KENNETH WAYNE PRICE, | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |
| Defendant and Appellant. | |

It is ordered that our opinion filed on October 7, 2020, be modified as follows:

1.  On page 5, the last sentence of the second full paragraph, beginning "A video of the incident obtained" is deleted and the following sentence is inserted in its place:

A video of the incident was obtained by the Garden Grove Police Department.  It showed Edwards fired one shot.  Edwards and Price then ran off screen

and another flash is visible.  Zhang said it was when Edwards and Price were off screen that they "switched the gun" and Price fired two shots.

2.  On page 17, delete the language in footnote 9, insert in its place:

Price claims he "was prejudiced by the court's error, or alternatively, by defense counsel's ineffective assistance."  Because we conclude any instructional error was harmless beyond a reasonable doubt, an ineffective assistance of counsel claim would fail the prejudice prong of such an analysis.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)  Price argues his counsel failed to "at least attempt to figure out" what the jury meant by its question concerning aiding and abetting.  The record, however does not support the argument.  When the court received the jury's question, it notified counsel and ordered counsel to return to the court.  Unfortunately, the record does not indicate what happened thereafter, prior to the court answering the question.  Without a record showing what occurred, we do not know what defense counsel's response to the question was.

This modification does not change the judgment.  The petition for rehearing is DENIED.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.


2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>KENNETH WAYNE PRICE,<br><br>    Defendant and Appellant. | G057277<br><br>(Super. Ct. No. 17WF2059)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Cassidy, Judge.  Affirmed as modified.

Sheila O'Connor, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M. Roadarmel, Jr., and David A. Wildman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Kenneth Wayne Price was convicted of one count of attempted murder (Pen. Code, §§ 664, subd. (a), 187, subd. (a)). [1] The court sentenced Price to the aggravated term of nine years and enhanced his sentence by adding two one-year terms based on his having served two prior prison terms pursuant to section 667.5, subdivision (b). On appeal, Price contends the trial court prejudicially erred in instructing the jury pursuant to CALCRIM No. 400 without adding the fact that an aider and abettor may be found guilty of a lesser offense than the perpetrator he aided and abetted, if he had a different state of mind than the perpetrator. Anticipating the Attorney General would assert the issue was forfeited because Price did not object to the instructions given and did not request modification, Price asserts the alleged instructional error violated his substantial rights and no objection or request for modification was required to preserve the issue. In the alternative, Price claims he was denied effective assistance of counsel because his counsel did not object to the instructions or request modification.

Price also argues the imposition of two one-year prior state prison term enhancements must be set aside because prior to his sentence being final, the Legislature amended subdivision (b) of section 667.5, restricting its reach to prison terms served for sexually violent felonies, and he is entitled to the retroactive application of the ameliorative amendment as neither of his prior prison commitments were for sexually violent offenses. The Attorney General properly concedes the issue.

We find the trial court did not commit prejudicial error on the instructional issue. Consequently, there is no need to address the ineffective assistance of counsel claim. We will order the terms imposed under former section 667.5, subdivision (b), stricken and affirm the judgment as modified.

---

[1] All undesignated statutory references are to the Penal Code.

2

Price was charged by way of information with one count of attempted murder (§§ 664, subd. (a), 187, subd. (a); count 1), shooting at an occupied motor vehicle (§ 246; count 2), possession of a firearm by a convicted felon (§ 29800, subd. (a)(1); count 3), and possession of ammunition by a prohibited person (§ 30305, subd. (a)(1); count 4). In connection with the attempted murder charge, the information alleged the crime was deliberate and premeditated (§ 664, subd. (a)). The information further alleged Price personally discharged a firearm during commission of the attempted murder (§ 12022.53, subd. (c)), personally discharged a firearm causing great bodily injury in the commission of the shooting at an occupied vehicle (§ 12022.53, subd. (d)), suffered a prior strike conviction (§§ 667, subds. (d), (e)(1), 1170.12, subds. (b), (c)(1)), suffered a prior serious felony conviction (§ 667, subd. (a)(1)), and served two prior separate terms in prison (§ 667.5, subd. (b)).

The jury found Price guilty of attempted murder, but found the allegation that the attempted murder was deliberate and premediated not true. The personal and intentional discharge of a firearm enhancements were also found not true. The jury returned a not guilty verdict on all the remaining charges. In a court trial held after the jury returned its verdicts, the court found Price did not suffer a prior strike conviction or serious felony conviction, but found the two state prison enhancement allegations true. The court subsequently sentenced Price to the upper term of nine years on the attempted murder conviction and imposed consecutive one-year terms on each of the two state prison prior enhancements, for a total sentence of 11 years. Price was awarded presentence credits of 184 actual days and 28 conduct credits for a total of 212 days. Thereafter, Price filed a timely notice of appeal.

*Prosecution Evidence*

On July 22, 2016, at approximately 10:00 p.m., Christopher Williams (Christopher), Zhang Molyneaux (the boyfriend of Christopher's sister Tallisha), Brittany

Molyneaux and her two daughters (six months and four years old) went to a marijuana dispensary on Katella Avenue in Garden Grove.[2] Brittany is Zhang's older sister.

Christopher drove them to the dispensary in Tallisha's 2009 Toyota Camry. Zhang was in the front passenger seat, Brittany sat behind Zhang with her daughters to her left in the back seat, the youngest in a car seat.

Zhang said he was uncomfortable with his sister Brittany going alone with Christopher because Christopher had told Zhang what he "used to do and what he was about." Zhang heard from Tallisha that Christopher was associated with criminal street gangs and his moniker was Baby Devil.

The group went to the dispensary that night because Zhang purchased a marijuana brownie at the dispensary the day before and left it there. Christopher suggested to Zhang that they go back and see if they could get the brownie.

Once they arrived in the very dark parking lot, Christopher and Zhang got out of the car and went into the dispensary, but were unable to obtain a brownie or a refund. After leaving the dispensary, they got some lemonade from a stand outside the dispensary. Shortly thereafter, Zhang was smoking a cigarette while leaning against the hood of the Camry, when he was approached by a "light-skinned guy" he had never seen before. Zhang said the male could have been Puerto Rican, Cuban, or Mexican and had short hair, a "low-cut" beard, and wore a black T-shirt. Zhang thought the male, who was later identified as Darrell Edwards, looked like the rapper Sean Paul.[3]

Edwards asked, "What's up?" Brittany told Zhang, "[L]et's go. I have a bad feeling." Edwards walked away toward the street after stopping to look inside the Camry. Zhang continued smoking his cigarette and Edwards returned with another male,

---

[2] For ease of reading and to avoid confusion, the Williamses and the Molyneauxes are referred to by their first names. No disrespect is intended.

[3] Edwards was not charged in the information.

4

later identified as Price. Zhang said Price was bigger and darker than himself, and wore a red hat, red shirt, and jeans. Zhang had never seen Price before.

Edwards and Price walked past the Camry and turned around. They returned to the Camry and approached the driver's door. Christopher was in the driver's seat. Price said, "Ha, ha, Baby Devil. Let me holla at you for a minute." Christopher got out of the car and Price told him, "Aww, shake my hand. Shake my hand." Christopher said he would not shake hands.

Zhang saw Edwards pull what he described as a black or black and silver Glock 16 or nine-millimeter from his waistband and fire one time at Christopher who was three or four feet away. Zhang said Price was next to Edwards when the shot was fired. Christopher started running after the shot. According to Zhang, the pistol jammed and Price took the pistol from Edwards, pulled back the slide, cleared the jammed casing, cocked it, and fired two shots at Christopher while Christopher ran to the back of the Camry. Zhang said he did not see Price with a firearm other than the one he took from Edwards.[4] Zhang stated Price was to the right of where he was seated in the Camry passenger seat when Price fired the two shots at Christopher. A video of the incident obtained by Sergeant Brian Dalton of the Garden Grove Police Department showed Edwards fired one shot and Price fired two.

Edwards and Price ran to the northeast after the shooting. Zhang got into the driver's seat and Brittany told him to "[g]et me out of here." Zhang saw his sister had been shot in the chest. He panicked and started screaming. A woman at the scene slapped him in the face and told him to "[g]et it together." He called the police, his mother, and his brother. When Brittany got out of the car, Zhang saw someone carrying Christopher and he realized Christopher was hurt. He had been shot. The ulna bone in

---

[4] Later that night, Zhang told police Edwards and Price each had a gun and that Price's was an all black Glock nine-millimeter. He also told police eight or nine shots were fired.

his left wrist and his hip were fractured. A bullet fragment was later removed from his wrist.

Surveillance videos were obtained from the dispensary and another business at that location. Zhang watched a video of the incident prior to testifying and said it showed Edwards fire a shot. On cross-examination, Zhang stated his testimony of the incident that occurred two years prior to trial, was based "50 percent" on having watched a video of the incident.

Brittany's version of the shooting differed from Zhang's. Brittany testified she asked where they were when the car pulled into the "very dark" parking lot of the dispensary that night. Upon being told they were at a dispensary, she asked why they were there, noting her children were in the car. She was very upset and did not want to be there.

Brittany said she and her children waited in the car for about five minutes while her brother and Christopher were inside the dispensary. When they got back to the car, Zhang smoked a cigarette while sitting on the hood of the car. She said Christopher got in the car and she wanted to leave. She felt uncomfortable being there. Her four year old appeared anxious and told her, "I'm ready to go."

At that point, Brittany saw a man approach the car and say hello to her brother, who said "Hi." Christopher got out of the car, shook the man's hand, and got back into the Camry. The man then went to the passenger side of the car, stooped down, looked into the window of the car, and walked away. She described this individual as light-complexioned, possibly Hispanic or "mixed," with long hair and wearing a black shirt. Brittany asked Christopher if he knew the man. He said he did not. A couple of minutes later the light-complexioned man returned with another man. The second man was "black," 5 feet 8 to 10 inches tall, muscular, with short hair and wearing a red shirt. She subsequently identified a photograph of Price as the "black" male.

6

The two men walked to the front of the Camry and told Zhang to get back into the car. The lighter-skinned male stayed at the front of the car. Price went to the driver's side and addressed Christopher as "Baby Devil" and told him to get out of the car. Price told Christopher to shake his hand. Christopher said, "No," and "kind of like pushed his hand away." Price again told Christopher to shake his hand, and Christopher refused again. Then Brittany saw two muzzle flashes and heard two gunshots, but she did not see a gun. One of her daughters screamed. According to Brittany, the "black" male shot Christopher. Christopher fell to the ground. He got up and ran to the back of the Camry.

Brittany leaned over to cover her children and to check on them. The baby was crying and her older daughter said she was okay. Then she checked on her brother in the front seat and, as she leaned back she felt "popped in the chest." Her older daughter said, "Mommy, you've been shot." Brittany did not see who fired the third shot. The light-skinned male and Price ran away.

Brittany was hospitalized for a week following the shooting. Doctors had to reinflate her left lung and she still has the bullet in her chest. It has left her with long-term breathing problems. The parties stipulated Brittany still had a bullet fragment inside her and suffered a collapsed lung and fractured sternum as a result of the incident.

On cross-examination, Brittany admitted she did not see Price fire a gun. Neither did she ever see him with a gun. She did not see anyone pull out a gun that night, but she said she is certain Price fired the first shots.

Garden Grove Police Detective George Kaiser responded to the scene that night. He found four bullet casings on the ground by the Camry. Two were on the driver's side and two were on the passenger's side. He located two apparent bullet impacts or holes on the passenger's side. One was in the rear passenger door beneath the window. The other was on the C-pillar, the "rear-most roof support structure."

7

A forensic scientist from the Orange County Crime Lab examined the Camry with an eye to the trajectory of the bullets that hit the car. She found a bullet hole that appeared as if the bullet could have gone into the trunk. Examining the trunk, she found a badly damaged bullet having the approximate weight and diameter of a .380-caliber bullet, as well as being a copper plated lead bullet.

Of the four bullet casings found at the scene, a F.C. nine-millimeter Luger casing was located in a parking stall to the north of the Camry. Another casing of the same make was also found. On the sidewalk area to the front of the Camry, were two Federal brand .380-caliber automatic casings. A firearms expert testified the two nine-millimeter casings were fired from the same nine-millimeter gun and the .380-caliber casings were fired from a single .380-caliber firearm.[5] The bullet fragment removed from Christopher's wrist was from a .380-caliber bullet.

Detective Kaiser interrogated Price at the Theo Lacy Facility approximately 10 months after the shooting on May 23, 2017. After being advised of his *Miranda*[6] rights, Price admitted being at the scene of the shooting. He said he had no problem with the driver of the Camry. The parties stipulated Price had a prior felony conviction.

*Defense Evidence*

Prior to testifying, Zhang was provided surveillance videos and a transcript of his previous interview with police. When Zhang reviewed the transcript of his interview, the district attorney investigator who provided Zhang with the videos and transcript asked Zhang if the transcript was accurate. Zhang said the transcript states there were two guns, but only one gun was involved.

---

[5] It is possible to fire a .380-caliber bullet from a nine-millimeter firearm, but the cartridge might bulge or crack because a nine-millimeter firearm has a wider chamber. Using .380-caliber ammunition in a nine-millimeter firearm could cause the gun to jam. A nine-millimeter bullet cannot be used in a .380-caliber firearm.

[6] *Miranda v. Arizona* (1966) 384 U.S. 436.

8

**DISCUSSION**

*Aiding and Abetting Instructional Issue*

Price contends the trial court erred in instructing the jury pursuant to CALCRIM No. 400 without informing the jury that an aider and abettor's culpability can differ from that of the actual perpetrator depending upon the state of mind of the aider and abettor. According to Price, the failure to so instruct the jury forced the jury into an all-or-nothing choice in its verdict on the attempted murder charge, causing the jury to convict Price for failing to stop Edwards from shooting at Christopher. Anticipating the Attorney General's argument that the issue was forfeited because he did not object to the instruction or request a modification, Price claims the instructional error violated his substantial rights and no objection or request was required. He further argues that should we find the instructional issue was forfeited, he is still entitled to reversal because the forfeiture was the result of counsel's ineffective assistance in failing to object or ask for modification.

"'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.]" (*People v. Sedeno* (1974) 10 Cal.3d 703, 715.) This obligation includes instructing "on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation] . . . ." (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) Indeed, when the trial court's obligation to instruct on lesser included offenses arises, the obligation is to "fully" instruct on lesser included offenses supported by the evidence. (*Id*. at p. 178.) The jury was instructed on attempted voluntary manslaughter as a lesser included offense of attempted murder, and a trial court has a sua sponte duty to "fully" instruct on lesser included offenses supported by the evidence. (*Ibid*.) We

9

therefore consider Price's argument. Our review of the instructional issue negates the need to address Price's alternative argument that if the issue was forfeited, then trial counsel failed to provide effective assistance in violation of the Sixth Amendment.

In our review of an instructional issue, we must determine "whether 'there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner.' [Citation.]" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220.) Our review of whether an instruction correctly states the law is de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.)

The jury was instructed pursuant to CALCRIM No. 400: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. [¶] A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

Immediately following its reading of CALCRIM No. 400, the court read CALCRIM No. 401 to the jury. "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone *aids* and *abets* a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

10

"If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.

"A person who aids and abets a crime is not guilty of that crime if he withdraws before the crime is committed. To withdraw, a person must do two things: [¶] 1. He must notify everyone else he knows is involved in the commission of the crime that he is no longer participating. The notification must be made early enough to prevent the commission of the crime. [¶] AND [¶] 2. He must do everything reasonably within his power to prevent the crime from being committed. He does not have to actually prevent the crime.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw. If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory." (CALCRIM No. 401.)

The court also instructed the jury on attempted voluntary manslaughter as a lesser included offense of attempted murder. (See *People v. Randle* (2005) 35 Cal.4th 987, 993-994 [voluntary manslaughter is lesser included offense of first degree murder].) An attempted murder is reduced to an attempted manslaughter when: "1. The defendant took at least one direct but ineffective step toward killing a person; [¶] 2. The defendant intended to kill that person; [¶] 3. The defendant attempted the killing because he was provoked; [¶] 4. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment; [¶] AND [¶] 5. The attempted killing was a rash act done under the influence of intense emotion that obscured the defendant's reasoning or judgment." (CALCRIM No. 603.)

In *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1162 (*Samaniego*), the issue before the court was whether an earlier version of CALCRIM No. 400

11

incorrectly stated the law.  At the time, CALCRIM No. 400 contained the following sentence:  "'A person is *equally guilty* of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.'"  (*Samaniego*, at p. 1163.)  The appellate court concluded CALCRIM No. 400 is *generally* an accurate statement of the law "in all but the most exceptional circumstances."  (*Id.* at p. 1165.)  It is not, however, always an accurate statement of the law.  In a prosecution for murder, the actual killer and the aider and abettor may have *different* liabilities even though the aider and abettor intended to aid an intentional killing.  (*People v. McCoy* (2001) 25 Cal.4th 1111, 1122 [liability of aider and abettor may be greater than that of perpetrator]; *Samaniego, supra*, 172 Cal.App.4th at p. 1164 [aider and abettor's liability may be less than that of the perpetrator].)

In *People v. McCoy, supra*, 25 Cal.4th 1111, our Supreme Court addressed the issue of whether an actual killer and his aider and abettor will always be equally guilty.  (*Id*. at p. 1114 ["granted review to decide whether an aider and abettor may be guilty of greater homicide-related offenses than those the actual perpetrator committed"].)  The *McCoy* court held "that when a person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own mens rea.  If that person's mens rea is more culpable than another's, that person's guilt may be greater even if the other might be deemed the actual perpetrator."  (*Id*. at p. 1122.)

The court gave an example of when an aider and abettor may be liable for a greater crime than the actual killer.  "As [an] example, assume someone, let us call him Iago, falsely tells another person, whom we will call Othello, that Othello's wife, Desdemona, was having an affair, hoping that Othello would kill her in a fit of jealousy.  Othello does so without Iago's further involvement.  In that case, depending on the exact circumstances of the killing, Othello might be guilty of manslaughter, rather than murder, on a heat of passion theory.  Othello's guilt of manslaughter, however, should not limit

12

Iago's guilt if his own culpability were greater. Iago should be liable for his own acts as well Othello's, which he induced and encouraged. But Iago's criminal liability, as Othello's, would be based on his own personal mens rea. If, as our hypothetical suggests, Iago acted with malice, he would be guilty of murder even if Othello, who did the actual killing, was not." (*People v. McCoy*, *supra*, 25 Cal.4th at pp. 1121-1122.)

After reviewing the decision in *McCoy*, the *Samaniego* court concluded that if an aider and abettor can be guilty of a greater crime than that committed by the perpetrator he aided and abetted, based on his (the aider & abettor's) state of mind, an aider and abettor can be guilty of a lesser crime than the perpetrator he aided and abetted, if he had a less culpable state of mind than the perpetrator. "Though *McCoy* concluded that an aider and abettor could be guilty of a greater offense than the direct perpetrator, its reasoning leads inexorably to the further conclusion that an aider and abettor's guilt may also be less than the perpetrator's, if the aider and abettor has a less culpable mental state. [Citation.]" (*Samaniego, supra*, 172 Cal.App.4th at p. 1164.)

The version of CALCRIM No. 400 provided to the jury in the present matter did not include the phrase "equally guilty." Rather, it stated, "A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." This instruction did not point out that an aider and abettor may be guilty of a lesser offense than the offense committed by the perpetrator and aided by the aider and abettor.

The trial court below instructed the jury on attempted voluntary manslaughter as a lesser included offense of attempted murder. In a situation like this, CALCRIM No. 400 is misleading. It fails to make clear an aider and abettor may have different culpability than the perpetrator aided and abetted. If Edwards deliberated and premeditated his attempt to kill Christopher, but Price only formed the intent to kill as a result of heat of passion or sudden quarrel sufficient to negate malice, it could be concluded that while Edwards committed attempted murder, Price committed the lesser

13

crime of attempted manslaughter.  In other words, one may aid and abet an act of attempted murder without incurring liability for attempted murder.  That being said, any error was harmless.

The instructions given the jury informed that in order to convict Price of attempted murder under an aiding and abetting theory, it must find Price *knew* of Edwards's unlawful purpose and *specifically intended* to, and did aid, facilitate, promote, encourage or instigate that *known* purpose.  Contrary to Price's contention, the instruction did not "force" the jury to into an all-or-nothing verdict.  The jury was also instructed on voluntary manslaughter as a lesser included offense, but that lesser charge was not part of the defense strategy; a strategy that proved very successful with the jury acquitting Price on three of the four charges, along with the special allegation that the attempted murder was deliberate and premeditated, and the personal discharge of a firearm enhancements charged in connection with the attempted murder and shooting at an occupied motor vehicle counts.  The defense was that Price did not aid and abet Edwards.  More precisely, it was that "even though he (Price) was there, he did not shoot a gun or know that . . . Edwards was going to shoot a gun."

"Attempted manslaughter based on a sudden quarrel or heat of passion has both a subjective and an objective component [citation] . . . .To satisfy the subjective component, the defendant must have attempted to kill 'while under "the *actual* influence of a strong passion" induced by [adequate] provocation.'  [Citation.] . . . 'No specific type of provocation is required, and "the passion aroused need not be anger or rage, but can be any ""[v]iolent, intense, high-wrought or enthusiastic emotion"'" [citations] other than revenge.'"  [Citation.]"  (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139.)  To support the objective component of heat of passion, """"the accused's heat of passion must be due to 'sufficient provocation.'"  [Citation.]'  [Citation.]"  (*People v. Moye* (2009) 47 Cal.4th 537, 549.)  "The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of

14

average disposition to act rashly or without due deliberation and reflection." (*Id*. at p. 550.)

Viewing the evidence in the light most favorable to Price, there is no evidence of a sudden quarrel or heat of passion. When Edwards first contacted Christopher, he and Christopher shook hands. Edwards then left after looking inside the Camry. He returned a few minutes later with Price. According to Brittany, the men told her brother to get back into the car and then Price called Christopher "Baby Devil" and told him to get out of the car. Thereafter, Christopher's only action in this matter was his refusal to shake Price's hand. Immediately after saying he would not shake Price's hand, *Edwards* pulled out a pistol and started shooting. There was no sudden quarrel or action on Christopher's part that could give rise to heat of passion. Indeed, the fact that Zhang was ordered to get back into the Camry and Christopher was told to get out of the same car tends to show Edwards and Price were looking to confront Christopher. His refusal to shake the hand of someone who ordered him out of a car would not provoke an ordinary person to react rashly.

Neither did CALCRIM No. 400 "force" the jury to convict Price because he failed to stop Edwards. CALCRIM No. 401 does not require an innocent person to attempt to stop a crime. CALCRIM No. 401 only puts that obligation on one who *is* an aider and abettor and who then attempts to withdraw from the criminal enterprise. To withdraw, an aider and abettor "must do two things: [¶] 1. He or she must notify everyone else he or she knows is involved in the commission of the crime that he or she is no longer participating. The notification must be made early enough to prevent the commission of the crime. [¶] AND [¶] 2. He or she must do everything reasonably within his or her power to prevent the crime from being committed. He or she does not have to actually prevent the crime." (CALCRIM No. 401.)

During deliberations, the jury sent a note to the court inquiring whether all four "points" [in CALCRIM No. 401] must be proven if it finds Price was at the scene

15

and did not withdraw or prevent the crime. In a second sentence it asked whether "the two paragraphs about aiding and abetting "are both required" "or are they independent." The court, after consultation with counsel, sent back a note to the jury stating *all four* elements set forth in CALCRIM No. 401[7] must be proved beyond a reasonable doubt. The court's answer to the first question reinforced the requirement that the jury could not return a guilty verdict on the charge of attempted murder unless it found beyond a reasonable doubt that Edwards committed the crime, Price knew Edwards intended to do so, Price intended to aid and abet the crime before or during its commission, and Price's words or conduct aided and abetted Edwards's commission of the crime.

As to the second question, the court informed the jury it did not know "which two paragraphs" the jury was referring to in its note, but that the entire instruction applies. Price fails to establish how that answer could have prejudiced him.

Additionally, we reject Price's contention that the prejudicial effect of instructing the jury pursuant to CALCRIM No. 400 was exacerbated by the prosecutor arguing an "old and wrong legal standard" during her argument to the jury.

In the present case, the prosecutor gave an example of aiding and abetting to the jury. In her example, a getaway driver *knows* his "buddy" is going to rob a bank. Knowing this, the getaway driver drives his buddy to the bank and waits in the vehicle outside the bank. When his buddy emerges from the bank and gets into the vehicle, the getaway driver drives them away from the scene, knowing the bank has just been robbed. The prosecutor explained that even though the getaway driver did not go into the bank and personally holdup the bank teller, the two are "equally guilty" of the crime. While not all aiders and abettors are necessarily guilty of the same offense or degree of offense

---

[7] "1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime." (CALCRIM No. 401.)

16

committed by the person they aided and abetted, depending upon the aider and abettor's state of mind (see *People v. McCoy, supra*, 25 Cal.4th at p. 1120; *Samaniego, supra*, 172 Cal.App.4th at p. 1164), in the prosecutor's example, however, the aider and abettor and the actual perpetrator *would* be equally guilty of robbery. While her example could be argued to have been inapt, it did not state "the old and wrong legal standard for aiding and abetting" as Price contends.

When the issue is whether a jury was properly instructed in connection with a lesser included offense, the *Watson*[8] standard applies. (*People v. Breverman, supra*, 19 Cal.4th at p. 149.) "Under *Watson*, instructional error requires reversal if the reviewing court, after considering the entire cause, including the facts, instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict, determines that "'it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error.'" [Citation.]" (*People v. Andrade* (2000) 85 Cal.App.4th 579, 588.) When an instructional error violates the federal Constitution, reversal is mandated unless the court finds the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

To the extent an asserted instructional error consists of a failure to instruct on a lesser included offense, "there must have been substantial evidence from which a jury reasonably could conclude that the defendant was guilty of the lesser offense, but not the greater offense. [Citation.]" (*People v. Flood* (1998) 18 Cal.4th 470, 481-482.) As we stated above (at p. 16, *post*), viewing the evidence in the light most favorable to Price, there is no evidence of sudden quarrel or heat of passion. Accordingly, any asserted error was harmless under both the *Watson* and *Chapman* standards.[9]

---

[8] *People v. Watson* (1956) 46 Cal.2d 818.

[9] This conclusion renders moot Price's alternative contention that his trial counsel was ineffective for failing to request modification of CALCRIM No. 400.

17

*State Prison Prior Enhancements*

As stated above, the trial court enhanced Price's sentence by imposing two consecutive one-year terms based on its finding Price previously served two separate state prison terms. At the time of Price's offense and sentencing, former section 667.5, subdivision (b), authorized a trial court to impose a one-year enhancement for each full, separate prison sentence previously served by the defendant, if the defendant had not thereafter remained free of prison custody and the commission of a new felony for a period of five years. (Stats. 2014, ch. 442, § 10.) While Price's appeal was pending, the Legislature amended subdivision (b) of section 667.5 to apply only to a prior prison sentence served on a conviction "for a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code . . . ." (§ 667.5, subd. (b); Stats. 2019, ch. 590, § 1, eff. Jan. 1, 2020.) Section 667.5, subdivision (b), presently provides: "Except where subdivision (a) applies, where the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail under subdivision (h) of Section 1170 is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term for a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code, provided that no additional term shall be imposed under this subdivision for any prison term served prior to a period of five years in which the defendant remained free of both the commission of an offense which results in a felony conviction, and prison custody or the imposition of a term of jail custody imposed under subdivision (h) of Section 1170 or any felony sentence that is not suspended." Price's prior prison terms were served on convictions for possession of a firearm by a felon (§ 29800, subd. (a)(1)) & attempted grand theft (§§ 664, subd. (a), 487, subd. (a)). Neither offense is listed in Welfare and Institutions Code section 6600.

18

Price argues in his supplemental opening brief that he is entitled to the retroactive benefit of the amendment. We accept the Attorney General's concession of the issue.

In *People v. Lopez* (2019) 42 Cal.App.5th 337, 341, the Fifth District held the recent amendment to section 667.5, subdivision (b) applies retroactively to judgments not yet final on its date of enactment. It based its decision on California Supreme Court decisions involving the retroactive application of ameliorative penal statutes. (*Ibid.*; see *People v. Brown* (2012) 54 Cal.4th 314, 323; *In re Estrada* (1965) 63 Cal.2d 740, 742-748.) We agree with the appellate court's analysis.

Accordingly, the enhancements imposed pursuant to former section 667.5, subdivision (b) are ordered stricken. As the trial court imposed the maximum possible sentence on the only offense for which Price was convicted, there is no reason to remand this matter for resentencing in light of our decision.

## DISPOSITION

The two enhancements imposed pursuant to former section 667.5, subdivision (b) are stricken. The clerk of the superior court is directed to prepare an amended abstract of judgment showing the superior court imposed a nine-year prison commitment, and to mail a certified copy to the Department of Corrections and Rehabilitation. The judgment is affirmed as modified.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


ARONSON, J.

20